# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| WESTERN STAR HOSPITAL AUTHORITY | : | |
| INC., t/d/b/a METRO HEALTH EMS | : | CIVIL ACTION |
| Plaintiff | : | |
| vs. | : | |
| | : | |
| SUSAN MCCAFFREY, | : | |
| BARBARA FORSHA, | : | |
| ROGERT SCHOLLAERT, | : | NO: |
| DAVID UTTER, | : | |
| LAURA BAUMGART, | : | |
| UNIVERSITY OF PITTSBURGH MEDICAL | : | |
| MEDICAL CENTER, aka, UPMC, | : | |
| UNIVERSITY OF PITTSBURGH MEDICAL | : | |
| CENTER MEDCALL, aka, UPMC MEDCALL, | : | |
| MEDEVAC AMBULANCE, aka | : | |
| MEDEVAC AMBULANCE SERVICE, | : | |
| A DIVISION OF PENNSYLVANIA MEDICAL | : | |
| TRANSPORT, INC. | : | |
| AARON RHONE, | : | |
| TRAVIS WOODYARD, | : | |
| BRIAN SHAW, | : | |
| AMOS CAMERON and | : | |
| MYRON RICKENS | : | |
| Defendants | : | |

## COMPLAINT

{01748976;v1}

1

## THE PARTIES

**A.**   **Plaintiff**

1.     Plaintiff Western-Star Hospital Authority, Inc. t/d/b/a Metro-Health, EMS ("Plaintiff"), is an emergency transportation company that provides basic life support and advanced life support ambulatory services to the greater Pittsburg area.

2.     Plaintiff's offices are located at 204 Kenmar Drive, Suite 4, Monroeville, Pennsylvania 15146.

3.     B. Lamont Doyle, Chief Operating Officer of Plaintiff Metro-Health EMS, is of African American descent.

4.     In that regard, Plaintiff is owned and operated by minorities.

**B.**   **Defendants**

5.     Defendant Susan McCaffrey is an adult resident of the Commonwealth of Pennsylvania, who resides 415 Farrington Drive, Seven Fields, Pennsylvania 16046.

6.     At all times relevant hereto, Defendant McCaffrey was the Vice President, Facilities Management, VA Pittsburgh Healthcare System of the Department of Veterans Affairs in Pittsburgh, Pennsylvania (the "VA" or "Pittsburgh, VA").

{01748976;v1}                                    2

7.      Defendant Barbara Forsha is an adult resident of the Commonwealth of Pennsylvania, who resides at 1036 Old Post Road, South Park Township, Pennsylvania 15129.

8.      At all times relevant hereto, Defendant Forsha was the Deputy Director of Healthcare at the VA.

9.      Defendant Robert Schollaert is an adult resident of the Commonwealth of Pennsylvania, 234 Darlan Hill Drive, Pittsburgh, Pennsylvania 15239.

10.     At all times relevant hereto, Defendant Schollaert was the Supervisory Program Specialist for the Pittsburgh VA.

11.     Defendant David Utter is an adult resident of the Commonwealth of Pennsylvania, who resides at 204 Jacobs Court, Cranberry Township, Pennsylvania 16066.

12.     At all times relevant hereto, Defendant Utter was the Transportation and Fleet Operations Manager of the VA.

13.     Defendant Laura Baumgart is an adult resident of the Commonwealth of Pennsylvania who resides at 912 Rivert Oaks Drive, Pittsburgh, Pennsylvania, 15215.

14.    At all times relevant hereto, Defendant Baumgart was the Executive

Assistant to the Director of the VA.

15.    The VA is a federal cabinet-level agency that provides healthcare and

related services to military veterans at VA medical centers and other outpatient

medical treatment centers.

16.    Among the medical centers utilized by the VA is University of

Pittsburgh Medical Center, aka UPMC ("UPMC").

17.    Defendant UPMC is a health care provider and insurer located at 200

Lothrop Street, Pittsburgh, PA 15213.

18.    Defendant UPMC operates more than thirty (30) academic,

community, and specialty hospitals across Pennsylvania.

19.    Defendant UPMC Medcall, aka, UPMC Medcall, runs a program

known as "Medcall" a/k/a "PARC" ("PARC").

20.    PARC is an ambulance brokerage service for all UPMC-run facilities.

21.    Defendant UPMC/PARC receives incoming calls from patients in

need of non-emergency transportation services, and assigns the call to one of

several EMT companies with which it partners.

22.    Defendant Medevac Ambulance, aka Medevac Ambulance Service, a

division of Pennsylvania Medical Transport, Inc. ("MAC") is an ambulance

company with offices located at 332 Wampum Avenue, Elwood City, Pennsylvania.

23.    Defendant MAC is owned by Edward Heltman.

24.    At all times relevant hereto, UPMC/PARC retained MAC to perform services as staff/paramedics, at the VA hospitals in Pittsburgh and the surrounding areas.

25.    In that regard, at all times relevant hereto, Defendant MAC served as the staffing agent for VA hospitals in Pittsburgh and the surrounding areas.

26.    Defendant Aaron Rhone is an adult resident of the Commonwealth of Pennsylvania, who resides at 67 Kutz Road, Carlisle, Pennsylvania, 17015.

27.    At all times relevant hereto, Defendant Rhone was the Emergency Medical Systems ("EMS") Program Manager of the Commonwealth of Pennsylvania Bureau of Emergency Medical Services.

28.    Defendant Travis Woodyard is an adult resident of the Commonwealth of Pennsylvania who resides at 625 Forster Street, Harrisburg, Pennsylvania 17120.

29.    At all times relevant hereto, Defendant Woodyard was an EMS Program Specialist with the Commonwealth of Pennsylvania Bureau of Emergency Medical Services.

{01748976;v1}

30.     The Commonwealth of Pennsylvania Bureau of Emergency Medical Services ("BEMS"), is the agency responsible for the statewide development and coordination of a comprehensive system to prevent and reduce premature death and disability.

31.     In that regard, BEMS has the responsibility for licensing all emergency medical service agencies and all prehospital care providers in the Commonwealth.

32.     Defendant Brian Shaw is an adult resident of the Commonwealth of Pennsylvania who resides or can be served at 1 Hospital Way, Butler, Pennsylvania 16001.

33.     At all times relevant hereto, Defendant Shaw was the Deputy Director of Emergency Medical Services West ("EMS West").

34.     Based on information and belief, Emergency Medical Services West is a fictitious name for the Emergency Medical Services Institute ("EMSI").

35.     Defendant Amos Cameron is an adult resident of the Commonwealth of Pennsylvania, who resides at 492 Washington Street, Leesdale, Pennsylvania, 15056.

36.     At all times relevant hereto, Defendant Cameron was an inspector for EMS West.

37.    In Pennsylvania, the emergency medical services (EMS) system, established under the Emergency Medical Services Systems Act, 35 Pa.C.S.A. § 8101, *et. seq.*, is regulated by BEMS, which is a bureau within the Commonwealth of Pennsylvania's Department of Health ("DOH").

38.    BEMS carries out its regulatory function with the assistance of regional EMS councils and a State Advisory Board.

39.    35 Pa.C.S.A. § 8103, includes the following definition:

**"Regional emergency medical services council"** or **"regional EMS council."**

A nonprofit incorporated entity or appropriate equivalent that is assigned by the Department of Health to:

(1) plan, develop, maintain, expand and improve emergency medical services systems within a specific geographic area of this Commonwealth; and
(2) coordinate those systems into a regional emergency medical services system.

40.    EMS West is one of these regional EMS councils.

41.    BEMS achieves its central mission of promoting the effective and efficient operation of statewide and regional EMS systems through a number of statutorily mandated tasks, e.g., transportation and coordination.

42.     DOH itself has the authority and the duty to establish, investigate and enforce regulatory standards for, e.g., EMS services and personnel, and to assist with dispatch protocols, and to prepare a comprehensive EMS System Plan for Pennsylvania.

43.     Pursuant to statutory authority, DOH can license various EMS agencies and providers in a range of practice areas.

44.     BEMS is supported in carrying out its state statutorily mandated EMS tasks and services by the regional councils, such as EMS West.

45.     Regional councils like EMS West are required to assist BEMS in carrying out the provisions of Pennsylvania's EMS Act, and to follow DOH's and BEMS' policy directions.

46.     Pursuant to 35 Pa.C.S. § 8109(a), these regional councils "***shall*** assist the department [DOH] in carrying out the provisions of this chapter. ***Each regional EMS council shall adhere to policy direction from the department***." (Emphasis added).

47.     Regional council duties are listed in 35 Pa.C.S. § 8109(c), which statutory section begins, "Each regional EMS council ***shall, if directed by the department***…." (Emphasis added).

48.     Section 8109(c) lists twelves specific duties, and a thirteenth category that the regional councils, "Perform other duties assigned by the department to assist the department in carrying out the requirements of this chapter." Id. at § 8109(c)(13).

49.     For example, under section 8109(c)(8), DOH and BEMS can direct that a regional council: "Establish, subject to department approval, regional EMS triage, treatment and transportation protocols consistent with Statewide protocols adopted by the department. A regional EMS council may also establish, subject to department approval, additional triage, treatment and transportation protocols. No regional protocol shall be subject to the rulemaking process."

50.     Regional councils like EMS West have been delegated public functions in the Commonwealth's EMS management.

51.     EMS West's role as a regional council is entwined with the Commonwealth's polices, and BEMS is entwined with EMS West's management and/or control in EMS West's role as a regional council.

52.     Under the Commonwealth's EMS system and plan, EMS West performs inspections and licensing, traditional government functions.

{01748976;v1}

53.     These government functions, performed by regional councils like EMS West, are performed under color of state law.

54.     EMS West is governed by its Board of Directors.

55.     Defendant Myron Rickens is an adult resident of the Commonwealth of Pennsylvania, Pennsylvania, 16 Greenlawn Drive, Pittsburgh, Pennsylvania, 15220.

56.     At all times relevant hereto, Defendant Rickens was a member of the Board of Directors of EMS West.

57.     In addition, at all times relevant hereto, Defendant Rickens was the Director of Defendant UPMC.

58.     As set forth in this Complaint, Defendants used the inspection and licensing functions of EMS West, in their individual capacities, acting in concert with the other Defendants and as part of their conspiracy aimed at undermining and terminating Plaintiff's Contract with the VA, because of racial animus, bias and prejudice.

## **JURISDICTION**

59.     Jurisdiction in this matter is proper pursuant to 28 U.S.C. § 1331, as this matter arises under the Constitution and Law of the United States, and pursuant to 28 U.S.C. § 1343(a)(3), as this action is seeking redress for "the

{01748976;v1}

10

deprivation, under color of any State law, statute, ordinance, regulation, custom or usage, of any right, privilege or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States." This Court may exercise supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367, as these claims are so related to federal claims in this Court's original jurisdiction that they form part of the same case or controversy.

## **VENUE**

60.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b)(1) because Defendants Rhone and Woodyard reside in this Judicial District, and all Defendants are Pennsylvania residents.

## FACTUAL ALLEGATIONS

61.    On December 2016, the United States Department of Veterans Affairs (the "VA") awarded Plaintiff Metro a contract to provide ambulance services to veterans' hospitals in Pittsburgh, Pennsylvania (the "Contract").  A copy of the Contract is attached hereto as Exhibit "A".

62.    Plaintiff was the first company owned by an African American to secure a contract for ambulances services of this magnitude with the VA for the Pittsburgh area.

63.    Because an African American owns Plaintiff, during the application process and throughout the life of the Contract, Defendants McCaffrey, Forsha, Schollaert, Utter, Shaw and Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC and Rickens and Darby of Defendant UPMC's PARC program (hereinafter referred to collectively referred to as "Defendant UPMC/PARC") and Heltman and Joseph of MAC, interfered with the Contract and/or conspired with one another to undermine Plaintiff's Contract with the VA and to deprive Plaintiff of its rights under the Contract, as well as its Constitutional rights.

64.    On or about March 2016, Angelamarie Scott, a contract specialist with the VA, and Keith Watson, a Contracting Officer Representative ("COR") with

{01748976;v1}

the VA, put out for bid, a contract for ambulance and paramedic services for the VA in Pittsburgh and the surrounding areas (the "Solicitation").

65.     When the VA issued the Solicitation in March 2016, Defendant UPMC/PARC, through its agent Defendant MAC, was providing the ambulance and paramedic services for the veteran hospitals in Pittsburgh.

66.     Plaintiff was the only contractor to submit a bid in response to the Solicitation (the "Bid").

67.     Based on information and belief, Defendant Utter, Transportation and Fleet Operations Manager of the VA, reviewed the Bid.

68.     Defendant Utter did not know, or know about, Plaintiff before Plaintiff submitted the Bid.

69.     Nevertheless Defendant Utter rejected Plaintiff's Bid.

70.     Defendant Utter putatively reviewed the Bid before rejecting it, but in fact he rejected the Bid faster than he had ever reviewed and/or rejected a bid submitted by any other contractor, indicating that he either did not review the Bid, or gave only a cursory and inadequate review with the intent to reject the Bid.

71.     Defendant Utter rejected the Bid because an African American owns and operates Plaintiff and, for those reasons alone, he doubted Plaintiff's ability to perform the Contract.

{01748976;v1}

13

72.     When Defendant Utter rejected Plaintiff's Bid the VA canceled the Solicitation and Defendant UPMC/PARC through MAC continued servicing the VA hospitals.

73.     Scott and Watson reissued the Solicitation in August 2016.

74.     Plaintiff submitted a bid in response to thereto ("Bid No. 2").

75.     This time, although Plaintiff's application made it past Defendant Utter, Plaintiff encountered new roadblocks.

76.     Based on information and belief, following the submission of Bid No. 2, based on agreements between Defendants Utter, Shaw, Cameron and Rickens, individually and/or in concert, acting in their individual and not official capacities; Miles Darby of UPMC/PARC and Ronald Joseph of MAC, EMS West Regional Licensing Manager, Scott Crawford (at the behest of Defendants Shaw, Cameron and Rickens) delayed in submitting Plaintiff's application.

77.     They did so for utterly meritless reasons that had no basis in reality, which Defendants Utter, Defendants Utter, Shaw, Cameron and Rickens knew were unfounded and unwarranted.

78.     First, Crawford, rejected Plaintiff's application because Plaintiff: (a) failed to capitalize the street name and city of the station location; (b) failed to

include a space between a comma and the word "Inc."; and (c) failed to register the name "Metro-Health," as a fictitious name with the PA Department of State.

79.     These were not in fact legitimate bases to reject the application, which fact Crawford knew or recklessly disregarded, but based on information and belief he rejected this application as a result of communications with one or more of Defendants Utter, Shaw, Cameron and Rickens, who were encouraging the rejection as part of a scheme to thwart Plaintiff.

80.     Then Crawford rejected Plaintiff's application *allegedly* because Plaintiff: (a) failed to list appropriate radio communications devices; (b) failed to list all relevant information for the EMS vehicles; and (c) failed to include the expiration dates of its employees' "EMVCO" certifications.

81.     Again, these were not in fact legitimate bases to reject the application, which fact one or more of Defendants Utter, Shaw, Cameron and Rickens knew or recklessly disregarded.

82.     But, based on information and belief Crawford rejected this application as a result of communications with one or more of Defendants Utter, Shaw, Cameron and Rickens, who were encouraging the rejection as part of a scheme to thwart Plaintiff.

83.     Some of the alleged "defects" were on each version of the application submitted by Plaintiff, yet Crawford (at the behest of Shaw, Cameron and Rickens, disclosed each of the alleged "defects" on separate occasions, thereby causing Plaintiff to submit, unknowingly, some of the same allegedly incorrect information repeatedly.

84.     Due to this these pretextual deficiencies and/or EMSW's delay, caused by Defendants Utter, Shaw, Cameron and Rickens, acting in their individual capacities and abusing their positions at EMS West, in communicating them to Plaintiff, EMS West did not approve Plaintiff's application for submission until the end of December 2016.

85.     Plaintiff eventually secured the Contract, but as described below, the Contract was eventually undermined through Defendants' conduct in seeking its racially motivated termination.

86.     After Plaintiff secured the Contract and throughout the Contract, Defendants Utter, Shaw, Cameron and Rickens, individually and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC developed and/or participated in several schemes to interfere with and/or undermine the Contract because of racial bias and prejudice toward Plaintiff.

87.     Based on information and belief, shortly after Plaintiff secured the Contract, Defendant Utter told Rickens, the Director of UPMC/PARC, that he could get MAC more time as the sole ambulance/paramedic company servicing the VA by assuring that Plaintiff's equipment failed inspections.

88.     Inspecting the equipment of VA contractors was not a part of Defendant Utter's duties and responsibilities.

89.     Rather, these inspections were conducted by EMS West, the contractor retained by the Commonwealth of PA, applying Pennsylvania laws, rules, regulations, practices and/or customs.

90.     Therefore, to accomplish this goal, Defendant Utter had to secure the assistance and cooperation of the Commonwealth entities (EMS West), and Commonwealth officials or employees associated with those entities (DOH), willing to act in their individual capacities to undermine Plaintiff.

91.     Based on information and belief, Defendant Utter conspired and acted in concert with Defendants Shaw, Cameron and Rickens, who were willing to abuse their positions at EMS West (through DOH), and use Pennsylvania state licensing law, regulations and procedures to interfere with Plaintiff's rights and interest in the Contract, because of racial animus, bias and prejudice.

{01748976;v1}

92.     Shortly after the VA awarded the Contract to Plaintiff, Plaintiff experienced unreasonable, unnecessary and unprecedented delays in, and/or requirements for, the licensure and/or inspection of its vehicles and/or equipment, at the hands of Defendants Utter, Shaw, Cameron and Rickens, who were abusing their positions at EMS West (through DOH) under color of Pennsylvania state licensing law, regulations and procedures to interfere with Plaintiff's rights and interest in the Contract because of racial animus, bias and prejudice toward Plaintiff.

93.     Within the first month of the term of the Contract, Defendants Shaw, Cameron and Rickens, individually and/or in concert, acting in their individual and not official capacities, secured from the VA (including Defendant Utter), information related to Plaintiff's responsibilities under the Contract and began inspecting Plaintiff's vehicles and equipment.

94.     Over the course of the next month, Defendants Shaw, Cameron and Rickens inspected and/or directed others to inspect Plaintiff's vehicles three (3) times during the months of January 2017 and February 2017.

95.     On the first of the three (3) inspections, EMS West failed all of Plaintiff's vehicles.

96.     Based on information and belief, the issues that resulted in the failures were: (a) fabricated by Defendants Shaw and Cameron and (b) items that, under normal circumstances, would not have resulted in the failure of the equipment.

97.     Defendants Shaw and Cameron abused their positions and acted in their individual capacity in doing so.

98.     For example, several pieces of equipment that Defendants Shaw and Cameron labeled as "not working" following the January 24, 2017 inspection were marked as "working" during the February 6, 2017 inspection, although Plaintiff had not repaired the equipment in between the two (2) inspections.

99.     Defendants Shaw and Cameron and/or others acting at their direction, failed Plaintiff's vehicles and/or equipment for: (a) the absence of "No Smoking" and/or "Fasten Seatbelt" signs in the ambulances; (b) incorrectly sized "Star of Life" decals on the exterior of the vehicles; and/or (c) an insufficient number of towels and/or surgical caps in the vehicles - issues and/or conditions that did not warrant failure of the equipment and/or vehicles.

100.    Defendants Shaw and Cameron, in their offices at EMS West, which they were abusing in their individual capacities, failed Plaintiff's vehicles despite the fact that, as Robert Smith, an inspector with EMS West stated to Plaintiff, "I

don't understand how you guys failed inspection. I've never seen or heard of a company failing inspection."

101.   In fact, based on information and belief, on at least one occasion, Smith inspected and passed one of Plaintiff's vehicles which, during the same inspection session, Defendants Shaw subsequently failed.

102.   George J. Aupperlee, Ambulance Licensure Coordinator for the Pennsylvania Department of Health, Bureau of EMS, made a similar comment to Plaintiff similar to that made by Smith.

103.   Based on information and belief, prior to failing Plaintiff's vehicles and/or equipment, EMSW had not failed any prior contractors who provided ambulance and paramedic services for the same or similar alleged violations.

104.   After EMS West failed Plaintiff's vehicles, Plaintiff contacted Defendants Rhone and Woodyard, DOH/BEMS, and reported a conflict of interest and racial animus involving EMS West.

105.   Specifically, Plaintiff reported that Board Members of EMS West (Heltman and Defendant Rickens) hired, managed and/or operated MAC, the company that was servicing the VA.

106.   Defendants Rhone and Woodyard took no action in response to Plaintiff's complaint.

{01748976;v1}

20

107.   Instead, Defendant Rhone and Woodyard contacted Scott (the Contract Specialist) and Watson, (COR) Watson to secure information related to the nature of the Contract awarded to Plaintiff, including the amount and the proposed starting date.

108.   After EMS West completed the last of the three (3) inspections of Plaintiff's vehicles, EMS West issued Plaintiff a "restricted" license, apparently due to the aforementioned "failures" for which EMS West cited Plaintiff.

109.   This is the result of the pretextual violations issued by Defendants Shaw and Cameron in their individual capacities, in concert and coordination with Defendant Utter, UPMC/PARC (Rickens) and MAC (Heltman).

110.   As set forth above, these supposed "failures" were merely pretexts to undermine Plaintiff, and were actually the result of the misconduct of Defendants Rhone and Woodyard, individually and/or in concert, acting in their individual capacities in abusing their positions at DOH/BEMS; Defendants Shaw, Cameron and Rickens, individually and/or in concert, acting in their individual capacities in abusing their positions at EMS West, and the laws, rules, regulations, practices or procedures of the Commonwealth of Pennsylvania; Defendants McCaffrey, Forsha, Schollaert, Utter, individually and/or in concert, acting in their individual

capacities in abusing their positions and at the VA; along with Defendants

UPMC/PARC and MAC because of racial animus, bias and prejudice.

111.   The actions of Defendants Utter, Shaw, Cameron, Rhone and

Woodyard, individually, and/or in concert, acting in their individual and not

official capacities, along with UPMC/PARC and MAC, were part of the same

conspiracy and concerted action among them to interfere with and undermine the

Contract, so that Plaintiff would fail to perform and/or the VA would terminate

the Contract, because of their racial animus, bias and prejudice against Plaintiff.

112.   Consequently, although Plaintiff was slated to begin the work under

the Contract in January 2017, it did not commence work until late February 2017

almost two (2) months after VA awarded it the Contract.

113.   Based on information and belief, during this time, MAC, through

UPMC/PARC, remained the sole ambulance/paramedic company servicing VA

hospitals until EMS West issued Plaintiff its license to operate.

114.   In this regard, Defendants Utter, Shaw, Cameron, Rhone and

Woodyard, individually, and/or in concert, acting in their individual and not

official capacities, along with UPMC/PARC and MAC, succeeded in securing

MAC additional time to service the VA hospitals with ambulance services until

late February 2017, when EMS West issued Plaintiff the "restricted" license.

115.   Moreover, Defendants Utter, Shaw, Cameron, Rhone and Woodyard, individually, and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC, succeeded in securing MAC additional time to service the VA hospitals with critical care transportation services until March 1, 2016, when EMSW issued Plaintiff a full license to operate

116.   As a part of the same conspiracy and concerted action among Defendants Utter, Shaw, Cameron, Rhone and Woodyard, individually, and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC, Defendants developed and/or participated in several schemes to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract, imposed unreasonable and unprecedented restrictions and/or requirements on Plaintiff.

117.   Following the aforementioned inspections, Defendants Rhone, Woodyard, Shaw, and Cameron, individually, and/or in concert, acting in their individual and not official capacities, told Plaintiff, for the first time, that its vehicles were required to have radio communications capability with Allegheny County EMS 911 dispatch.

118.    When Plaintiff contacted John Rowntree, Radio Systems Coordinator for Allegheny County (greater Pittsburgh area), to secure the capability, Mr. Rowntree told Plaintiff that Allegheny County does not allow access to the system for services they do not dispatch.

119.    In addition, Mr. Rowntree told Plaintiff that there were other licensed private ambulance companies operating in the area that did not have access to Allegheny County's frequency.

120.    After Plaintiff achieved the required licensure, Defendant Utter conspired with other Senior Management officials at the VA, including, but not limited to, Defendants McCaffrey, Forsha and Schollaert, acting in their individual capacities; Defendants Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities; UPMC/PARC and MAC to undermine Plaintiff's performance under the Contract.

121.    Based on information and belief, for the first time in the history of the administration of the Contract, Senior Management officials of the VA, including, but not limited to Defendants McCaffrey, Forsha, Schollaert, Baumgart and Utter, acting in their individual capacities, participated in the day-to-day operations of the administration of the Contract.

122.   Based on information and belief, Defendants McCaffrey, Forsha, Schollaert and Baumgart, and others, formed an oversight committee (the "Oversight Committee") to collect and compile data to undermine and/or terminate the Contract because of racial animus, bias and prejudice.

123.   Based on information and belief, shortly after they formed the Oversight Committee, the members of the Oversight Committee, individually and in concert, acting in their individual and not official capacities, informed VA staff members that Plaintiff was an African American owned company.

124.   In addition, the members of the Oversight Committee instructed VA staff members to document Plaintiff's performance of the Contract and bring it back to the Oversight Committee.

125.   Based on information and belief, the members of the Oversight Committee informed VA staff members that they wanted "bad data not good data."

126.   In particular, based on information and belief, Defendant Forsha told the staff members in attendance, Plaintiff is "minority-owned . . . I want a weekly [report on its] performance.  I want to know the bad not the good."

127.   Based on information and belief, the reference to "minority owned" in this context meant that because Plaintiff was owned by an African American, and

poor performance reports should be made to undermine Plaintiff's Contract because it was an African American owned business.

128.   Based on information and belief, Defendants McCaffery and Schollaert, members of the Oversight Committee told staff members to let them know every time Plaintiff was late so they could fine Plaintiff and reduce its pay.

129.   Following this directive, Plaintiff's employees observed VA hospital staff members checking watches and clocks when they picked up and dropped off hospital patients.

130.   Members of the Oversight Committee threatened VA staff members whom they suspected were reluctant to scrutinize Plaintiff's work at the heightened level and report alleged deficiencies.

131.   In fact, based on information and belief, Defendant Baumgart told Watson (an African American), "low lying fruit go first."

132.   The VA did not direct its employees to scrutinize and report perceived deficiencies of the paramedics employed by majority-owned UPMC/PARC and MAC to transport patients to VA hospitals to the same degree.

133.   Moreover, the VA had not directed its staff members to scrutinize Trancare, the majority owned company that had serviced the VA prior to Plaintiff.

{01748976;v1}

134.   Based on information and belief, the actions of Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Woodyad , Shaw and Cameron, individually and/or in concert, acting in their individual and not official capacities; along with UPMC/PARC and MAC were part of the same conspiracy and concerted action among them to interfere with and/or undermine the Contract, so that Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice.

135.   Based on information and belief, the fact that the Oversight Committee imposed this heightened scrutiny because Plaintiff is black owned, was not lost on VA staff members who received the directives or Plaintiff's employees, black and white.

136.   After the Oversight Committee issued its directive, a VA staff member at one of the VA hospitals alerted Plaintiff that the VA staff members received a memo directing them to "report anything you guys [Metro] do."

137.   The VA staff member then commented, "You guys are minority-owned, right?"

138.   Another VA staff member stopped one of Plaintiff's staff members and stated, "[w]e are watching [your] times.  We pay you all a lot and money and you're black-owned, too."

139.   On another occasion, a management level employee from one of the VA hospitals commented to Plaintiff, "Metro must be black-owned because I [have] never seen a member of management act and send [so] many email [message about] ambulances being 5 or 10 minutes late."

140.   He noted, [w]e waited hours, 2, 3 and even 4 hours for ambulances with Transcare and UPMC/PARC[,]" and management never expressed any concerns.

141.   Another management level employee from a VA hospital told Plaintiff that, over his forty (40) years history with the VA he had never experienced this level of interest from senior management in the operations of an ambulance contractor.

142.   One of Plaintiff's former employees, who had worked for Transcare and MAC, made a similar comment about the VA's treatment of Plaintiff.

143.   He noted, when he worked with Transcare and/or MAC, no one said anything to them when they were three (3), four (4) or even five (5) hours late with transports.

144.   Following the issuance of the Oversight Committee's directives, even Watson, the COR, expressed concerns that the actions by the Oversight Committee were based on the fact that Plaintiff was black owned.

{01748976;v1}

28

145.   Based on information and belief, to assure that he too reported even the most minor deficiencies in Plaintiff's performance, members of the Oversight Committee repeated the threat to Watson that "low lying fruit go first."

146.   Based on information and belief, members of the Oversight Committee, individually and in concert, acting in their individual and not official capacities, were so hostile to VA employees sympathetic to Plaintiff and reluctant to create the information and data that the Oversight Committee sought to terminate Plaintiff, that members of the Oversight Committee orchestrated the transfer of some VA employees to other departments/positions, and subjected others to sexual harassment allegations.

147.   At or around the time that the members of the Oversight Committee directed its staff members to scrutinize Plaintiff's performance under the Contract, UPMC/PARC and MAC directed their its employees to do so as well, via email message between March 2017 and July 2017.

148.   Based on information and belief, the foregoing facts reflect all Defendants' knowledge that Plaintiff was being targeted because of race, and that they were all acting in concert in carrying out this ongoing conspiracy to undermine Plaintiff's contract because of the race of Plaintiff's owner.

{01748976;v1}

29

149.   As such, based on information and belief, all of their individual misconduct was directly motivated by racial animus, bias, and prejudice, and was part of their overall scheme to work together to undermine Plaintiff's Contract, and each knew and accepted that the others would use their positions and efforts, in their individual capacities, to undermine Plaintiff's contract with the VA.

150.   Based on information and belief, UPMC/PARC and MAC sent multiple email messages to its employees stationed at VA hospitals directing them to employ heighted checks and requirements on Plaintiff, when Plaintiff presented to VA hospitals to transport patients.

151.   Based on information and belief, Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, knew that UPMC/PARC and MAC had issued these directives following their own directives to the VA employees.

152.   Based on information and belief, this conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC, to interfere with and/or undermine the Contract so that Plaintiff could not perform, which would then create an excuse for the VA to terminate the Contract.

{01748976;v1}

153.   Based on information and belief, in the furtherance of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Woodyard, Shaw and Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC, to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract, Defendants UPMC/PARC and MAC instructed their employees to (a) delay calling Plaintiff for transportation services, (b) alter Plaintiff's logged response times and (c) upgrade the call levels, to ensure that Plaintiff did not respond to calls timely and/or to ensure that Plaintiff did not present at the VA hospitals with the proper equipment.

154.   As set forth above, the root of this conspiracy, and these directives and efforts to effect the undermining of Plaintiff's Contract, was racial animus, bias and prejudice.

155.   UPMC/PARC and MAC engaged in this conduct throughout the Contract.

156.   Based on information and belief, Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, knew that UPMC/PARC and MAC was engaging in this conduct and took no action to stop it.

{01748976;v1}

31

157.   In addition, based on information and belief, Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, individually and in concert, acting in their individual and not official capacities directed VA employees to engage in similar conduct.

158.   Consequently, to further Defendants' conspiracy, representatives of the VA Transportation Department: (a) held calls to Plaintiff until late in the day (in most cases after 6:00 p.m.); (b) hold and bundle calls to force Plaintiff to juggle an excessive number of transports all at one time; and (c) hold long distance calls/trips until after 6:00 p.m., all to adversely affect Plaintiff's response time.

159.   Based on information and belief, this conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Defendants Utter, Shaw, Cameron, Rhone and Woodyard, individually, and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract.

160.   Based on information and belief, as part of the same conspiracy, UPMC/PARC and MAC employed other tactics designed to interfere with and/or

{01748976;v1}

32

undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract.

161.   Based on information and belief, UPMC/PARC and MAC employees began lodging false reports to representatives of the VA about Plaintiff's performance under the Contract.

162.   In addition, Defendants Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC conducted multiple unprecedented, unwarranted, random and unannounced inspections of Plaintiff's vehicles at various locations in the Pittsburgh area, including roadside, while Plaintiff's employees loaded patients in both emergency and non-emergency settings.

163.   Moreover, Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, individually and in concert, acting in their individual and not official capacities, allowed Rhone, Woodyard, Shaw and Cameron, acting in their individual and not official capacities, to situate themselves on Federal Property and wait for Plaintiff, in order to conduct such unwarranted, random and unannounced inspections.

164.   Based on information and belief, this conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha,

Schollaert, Baumgart, Utter, Rhone, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract.

165.   In addition, as part of Defendants' conspiracy, Defendants McCaffrey, Forsha, Schollaert, Baumgart and Utter, individually and in concert, acting in their individual and not official capacities, required Plaintiff to meet with them weekly, to review Plaintiff's performance under the Contract.

166.   This requirement was in place for the life of the Contract.

167.   The Contract did not call for any such meetings.

168.   On numerous occasions, without the consent of Plaintiff, Defendants McCaffrey, Forsha, Schollaert, Baumgart and Utter, acting in their individual capacities and abusing their offices at the VA as part of the conspiracy, allowed representatives of UPMC/PARC and MAC to participate in the meetings and/or comment on Plaintiff's performance under the Contract.

169.   Based on information and belief, the VA Senior Management officials did not require the prior contractor, Transcare, a majority owned company, to meet with them on a weekly basis to discuss its performance.

170.    Moreover, based on information and belief, the VA Senior Management officials did not require representatives of UPMC/PARC and MAC, majority owned to meet with them on a weekly basis to discuss its performance.

171.    This conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert Baumgart, Utter, Rhone Woodyard , Shaw and Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract.

172.    Throughout the Contract, due to the conspiracy and misconduct of Defendants Rhone, Woodyard, Shaw and Cameron, acting in their individual capacities and abusing their positions at DOH and EMS West, respectively, Defendants caused EMSW to subject Plaintiff to an unprecedented number of spot inspections.

173.    On March 16, 2017, approximately three (3) weeks after EMS West had completed the three (3) stage inspection of Plaintiff's vehicles referenced above, Defendants Rhone, Woodyard Shaw and Cameron conducted a "spot" inspection of Plaintiff's vehicles.

174.   Defendants Rhone, Woodyard, Shaw and Cameron, acting in their individual capacities as part of the conspiracy against Plaintiff, positioned themselves inside parking garages at the VA hospitals located in Aspinwall and Oakland, areas outside of Pittsburgh.

175.   Defendant Rhone, Woodyard, Shaw and Cameron checked the identification cards of Plaintiff's employees; inspected Plaintiff's trucks and equipment; and even stopped ambulances in the process of transporting patients to and from the hospitals.

176.   Defendants Shaw and Cameron stopped one paramedic crew twice, in the same day, for no apparent reason.

177.   Based on information and belief, Defendants Shaw and Cameron acted in their individual capacities, and their conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, acting in their individual capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice.

178.   At or around this time, Defendants Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, learned that

{01748976;v1}

36

Priority One, a private ambulance company in Pittsburgh, Pennsylvania, was assisting Plaintiff with satisfying its oblations under the Contract, via a mutual aid agreement.

179.   Based on information and belief, Defendants Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, and as part of the conspiracy against Plaintiff, retaliated against Priority One because it agreed to assist Plaintiff with performing the Contract.

180.   Shortly after Defendants Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, learned of the relationship between Plaintiff and Priority-One, Defendants Shaw and Cameron conducted an unannounced inspection of Priority One's licenses.

181.   In doing so, they acted in their individual capacities, as part of the conspiracy to undermine Plaintiff's contract.

182.   Based on information and belief, in the twenty-nine (29) years that Priority One had been in business as of that date, neither a Director nor a Deputy Director of EMSW had ever performed an unannounced inspection of Priority One to check its licenses.

183.   Based on information and belief, this conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha,

{01748976;v1}

Schollaert, Baumgart, and Utter, acting in their individual and not official

capacities, Defendants Rhone, Woodyard, Shaw and Cameron, individually and in

concert, acting in their individual and not official capacities, along with

UPMC/PARC and MAC to interfere with and/or undermine the Contract so that

Plaintiff would fail to perform and/or the VA would terminate the Contract

because of racial animus, bias and prejudice toward Plaintiff.

184.   Based on information and belief, in May 2017, less than two (2)

months following the spot inspection referenced above, Defendants Rhone,

Woodyard Shaw and Cameron conducted another spot inspection of Plaintiff's

ambulances, acting in their individual and not official capacities and as part of the

conspiracy against Plaintiff.

185.   Defendants Rhone, Woodyard Shaw and Cameron conducted the

inspections in such a hostile manner that five (5) of Plaintiff's employees quit,

immediately thereafter.

186.   Defendants Shaw and Cameron did not find and did not cite Plaintiff

for any violations.

187.   Sometime thereafter, Defendants Rhone and Woodyard inspected

Plaintiff vehicle again, acting in their individual and not official capacities and as

part of the conspiracy against Plaintiff.

{01748976;v1}

188.   This time, Defendants Rhone and Woodyard, suspended Plaintiff's license and shut down all of its operations for a week, allegedly because Plaintiff did not have the Allegheny radio frequency.

189.   Defendants Rhone and Woodyard, acting in their individual and not official capacities, reported their findings and actions to the VA.

190.   Further, Defendants Rhone and Woodyard declared that EMS West would have to inspect all of Plaintiff's ambulances before the EMS West could recertify Plaintiff.

191.   Based on information and belief, these inspections and the punishments that followed were carried out as part of the conspiracy to undermine Plaintiff's Contract, by using these Commonwealth agencies and Pennsylvania laws, rules, regulations, customs and/or practices, to improperly attack Plaintiff and to provide the individual VA officials, acting in their individual capacities, an excuse to end the VA's contract with Plaintiff, all because of racial animus, bias and prejudice.

192.   This conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to

{01748976;v1}

interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract.

193.   Based on information and belief, after Defendants Rhone and Woodyard shut down Plaintiff's operations, by or at the direction of Defendants Shaw and Cameron individually and in concert, acting in their individual and not official capacities, EMS West delayed in scheduling the inspections needed to recertify Plaintiff.

194.   Based on information and belief, this conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, acting in their individual and not official capacities, Defendants Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice toward Plaintiff.

195.   Based on information and belief, prior to the spot inspections that EMS West conducted on Plaintiff's vehicles beginning in January 2017, EMS West had not conducted spot inspections of the ambulances of any providers in years.

196.   In fact, EMSW's 2016-2017 Annual Report (the "Report") indicates that there are 302 EMS agencies in the region.

197.   Despite this high number, according to the Report, EMSW conducted only fifteen (15) unannounced spot inspections during the 2016 – 2017 timeframe.

198.   Plaintiff appealed the notices of violations issued by Defendants Rhone and Woodyard, who issued the pretextual violations acting in their individual capacities and as part of the conspiracy, following the May 2017 spot inspection.

199.   In response to Plaintiff's appeal, Paul S. Hoffman EMS Program Specialist with BEMS, dismissed all of the violations as meritless.

200.   Nevertheless, based on information and belief, at the behest of Defendants Shaw and Cameron acting in their individual capacities and as part of the conspiracy, EMS West conducted spot inspections of the ambulances owned by Plaintiff through mid-2018.

201.   Based on information and belief, this conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, acting in their individual and not official capacities, Defendants Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with

{01748976;v1}

41

UPMC/PARC and MAC to interfere with and/or undermine the Contract so that

Plaintiff would fail to perform and/or the VA would terminate the Contract

because of racial animus, bias and prejudice toward Plaintiff.

202.   Early in the Contract, Plaintiff complained to Defendants McCaffrey,

Forsha, Schollaert, Baumgart, Utter and COR Keith Watson about the conduct of

UPMC/PARC and MAC referenced above.

203.   Specifically, Plaintiff complained that UPMC/PARC and MAC were

purposefully trying to interfere with and/or undermine the Contract so that

Plaintiff would fail to perform and/or the VA would terminate the Contract.

204.   Based on information and belief, Defendants McCaffrey, Forsha,

Schollaert, Baumgart, and Utter and took no action in response to Plaintiff's

complaint.

205.   Based on information and belief, this conduct was a part of the same

conspiracy and concerted action among Defendants McCaffrey, Forsha,

Schollaert, Baumgart, and Utter, acting in their individual and not official

capacities, Defendants Rhone, Woodyard, Shaw and Cameron, individually and in

concert, acting in their individual and not official capacities, along with

UPMC/PARC and MAC to interfere with and/or undermine the Contract so that

Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice toward Plaintiff.

206.   Based on information and belief, based on Plaintiff's complaints and her observations and concerns about misconduct, contract interference and discriminatory conduct involving Defendant Utter, UPMC/PARC and MAC, VA Contract Specialist Scott, reported her concerns to the VA Office of the Inspector General.

207.   In 2018 and 2019, as a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart and Utter individually and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract, Defendants  imposed unreasonable and unprecedented restrictions and/or requirements on Plaintiff,  causing Plaintiff to continue experiencing (1) delayed calls; (2) altered logged response times; and (3) last minute or belated upgraded call levels.

208.   In addition, Defendant McCaffrey, Forsha, Schollaert, Baumgart, and Utter, acting in their individual capacities and as part of the conspiracy, continued to employ the unprecedented heightened scrutiny of Plaintiff's performance.

209.  This included, but was not limited to, unwarranted and unprecedented random and/or "emergency" inspections of its staff members and/or vehicles.

210.  In fact, at one point during 2018, after Plaintiff had performed under the Contract successfully for over a year, Mr. Watson demanded that Plaintiff present for "inspection," each member of its team who worked at the VA hospitals, based on information and belief, at the request and/or direction of Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, acting in their individual and not official capacities.

211.  This conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice.

212.  Further, based on information and belief, during 2018, as part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC, to interfere with and undermine the Contract so that Plaintiff would fail to perform and/or the VA

would terminate the Contract, employees of the VA, at the behest of Defendants, falsely accused Plaintiff of "cheating the government".

213.   In addition, based on information and belief, as part of the conspiracy, at the behest of Defendants, employees the VA, viciously and falsely accused Plaintiff of misrepresenting the identity of its Medical Director.

214.   Unfortunately, as a result of this harassment, and as a result of the conspiracy, at or around the time employees of the VA lodged this false accusation, at the behest of Defendants, Plaintiff's Medical Director, Dr. Thomas J. Powell, resigned his position with Plaintiff.

215.   Based on information and belief, during his tenure as Plaintiff's Medical Director, Dr. Powell received so many calls about Plaintiff from representatives of the VA and DOH (at the behest of Defendants, that addressing the questions interfered with his private medical practice.

216.   Based on information and belief, the calls were made by and/or at the direction and/or instruction of Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Shaw and/or Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC and MAC and as part of the same conspiracy described herein.

217.   This conduct was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Shaw and/or Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice.

218.   Consequently, Plaintiff was forced to secure the services of another Medical Director.

219.   Based on information and belief, in March 2019, as a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC,  to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract, Schollaert accessed the Pennsylvania Department of Health Emergency Medical Services portal (the "Website") to investigate the status of the licenses of Plaintiff's paramedics.

220.   Defendant Schollaert did so in his individual capacity, and as part of the conspiracy against Plaintiff.

221.   Based on information and belief, the Website reported, inaccurately, that the license of one of Plaintiff's paramedics had expired.

222.   On Friday, March 15, 2019, based on the inaccurate information, Defendant Schollaert telephoned and sent an email message to Plaintiff inquiring about the status of the licenses/certifications of its paramedics.

223.   Plaintiff, through Mr. Doyle, assured Defendant Schollaert that the licenses/certifications of its paramedics were current.

224.   Plaintiff, through Mr. Doyle, advised that he would submit proof on the following Monday.

225.   Defendant Schollaert did not wait for the proof, because, based on information and belief, his goal, individually and as part of the conspiracy was to undermine Contract with the VA, because of racial animus, bias and prejudice.

226.   Based on information and belief, on the evening of March 15, 2019, via a memorandum forwarded to all relevant VA departments of transportation, Defendant Schollaert directed the personnel to refrain from sending any calls for transport to Plaintiff.

227.   Due to the directives in the aforementioned memorandum, Plaintiff did not receive any calls for transport from the Friday evening of March 15, 2019 through Sunday, March 17, 2019.

228.   Based on information and belief, Defendant McCaffrey, Forsha, Schollaert Baumgart and Utter knew the information was false and used it to advance the conspiracy.

229.   Defendant Schollaert's conduct, in his individual capacity, using the Commonwealth of Pennsylvania website as part of the concerted action and conspiracy among the Defendants to undermine Plaintiff, and his act of sending this information to some of his co-conspirators, acting in their individual capacities, was done for the purpose of undermining Plaintiff's Contract with the VA, and not for any legitimate purpose.

230.   When Plaintiff inquired as to why it had not received any calls, Cynthia Grygier, Contracting Officer at that time, advised Plaintiff that the VA had terminated the Contract, effective March 21, 2019, for the "convenience" of the government.

231.   Based on information and belief, this contract termination was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Shaw and/or Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that

{01748976;v1}

48

Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice.

232.   Although the VA reportedly terminated the Contract for "convenience", on August 14, 2019, the VA issued a solicitation for the exact services it contracted with Plaintiff to perform – "to provide ground Ambulance Transportation Services to its veteran beneficiaries."

233.   Department officials reissued the solicitation on September 10, 2019.

234.   Based on information and belief, the VA did not award the Contract to a company owned and/or operated by an African American.

235.   In a decision dated December 6, 2019 (the "Decision"), Richard J. Anzelone, Branch Chief and Contracting Officer for the VA, explained why the VA terminated the Contract.

236.   According to Mr. Anzelone, "[f]rom the beginning of contract performance, the Contracting Officer's Representative (COR) in Pittsburgh received complaints about [Plaintiff's] performance."

237.   He wrote, that Plaintiff "had problems with safety and credentialing, to include no medical command discovered in June 2018 and expired PA EMS certificates of employees from December 2018 through March 2019."

238.   However, the alleged "problems with safety" were based upon false reports as to the putative inspections of Plaintiff's vehicles by individuals working at DOH/BEMS and EMS West and putatively applying Pennsylvania laws, regulations, rules and/or practices in results as a pretext to justify those reports.

239.   As set forth above, the inspections were extraordinary and unwarranted inspections, intentionally used to undermine Plaintiff's Contract with the VA.

240.   Similarly, the alleged "credentialing" problems arose out of similar extraordinary, repeated and unwarranted checks on Plaintiff's operations, intentionally used as a pretext to undermine Plaintiff's Contract with the VA.

241.   In that regard, the VA's termination of the Contract was a part of the same conspiracy and concerted action among Defendants McCaffrey, Forsha, Schollaert, Baumgart, and Utter, acting in their individual and not official capacities, Defendants Rhone, Woodyard, Shaw and Cameron, individually and in concert, acting in their individual and not official capacities, along with UPMC/PARC and MAC to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate the Contract because of racial animus, bias and prejudice toward Plaintiff.

{01748976;v1}

50

242.   Moreover, as the facts set forth herein illustrate, but for the fact that an African American owns and/or operates Plaintiff, none of the conduct referenced herein, including the termination for convenience would have occurred.

243.   While the nature of a conspiracy is to hide its planning and coordinated action among the conspirators, the facts alleged above set forth concerted action, which, under the totality of the circumstances alleged, must necessarily have been the result of an agreement among the Defendants, either directly amongst each other, or as coordinated through one or more of the Defendants who acted as the central hub of the conspiracy on which other of the Defendants were spokes on the wheel of conspiracy.

244.   Further, while the precise details of the conspiracy are not yet known, the conclusion is clear from the circumstances pleaded that all Defendants were part of, and shared in the objectives of, an agreement to terminate Plaintiff's contract with the VA; and the facts pleaded above demonstrate that this agreement among the Defendants was based upon, and motivated by, racial animus, bias and prejudice.

245.   At this stage, the conspiracy is evidenced by coordinated actions between the VA Defendants, and other Defendants carrying out state actions,

{01748976;v1}

alleged above, that would later be used by the VA Defendants, acting in their

individual capacities, as a false pretext to terminate the Contract when the true

reason was race based animus.

**Count I**
**Civil Rights Claims**
**Plaintiff v. All Defendants**

246.   Plaintiff incorporates paragraph 1 through 245 above as if fully set forth herein at length.

247.   42 U.S.C. § 1981 provides:

(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

(b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.

248.   The Fourteenth Amendment to the United States Constitution provides, in pertinent part:

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

249.   42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

250.   As set forth in detail above, Defendants have individually and in concert as part of a conspiracy amongst themselves and others, sought to undermine and then terminate Plaintiff's Contract with the VA based upon racial animus, bias and prejudice, and have deprived Plaintiff of its contractual rights under 42 U.S.C. § 1981, and deprived Plaintiff of the equal protection of the laws under the

Fourteenth Amendment to the United States Constitution, and Defendants are subject to suit and damages therefor under 42 U.S.C. § 1983.

251.   Defendants have deprived Plaintiff of its rights, privileges and/or immunities under federal law and/or the United States Constitution, that occurred under color of state law.

252.   As a result thereof Plaintiff has suffered $4,200,000 in damages.

253.   But for Defendants' racial animus, bias and prejudice in carrying out the acts, Plaintiff's contract with the VA would not have been terminated, and Plaintiff would also not have suffered $4,200,000 in damages.

254.   Defendants acted knowingly, wantonly, outrageously, and/or with reckless or callous indifference in taking the foregoing actions to deprive Plaintiff of its rights.

255.   Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

256.   Wherefore, Plaintiff Western-Star Hospital Authority, Inc. t/d/b/a Metro-Health, EMS demands judgment in its favor and against all Defendants in the amount of $$4,200,000, plus attorneys' fees, costs, interest, punitive damages, and any other relief that this Honorable Court deems just and proper.

## Count II

{01748976;v1}

## Civil Rights Claims 42 U.S.C. §§ 1983, 1985
## <u>Plaintiff v. All Defendants</u>

257.   Plaintiff incorporates paragraph 1 through 256 above as if fully set forth

herein at length.

258.   42 U.S.C. § 1985(3) provides:

> If two or more persons in any State or Territory conspire or go
> in disguise on the highway or on the premises of another, for
> the purpose of depriving, either directly or indirectly, any
> person or class of persons of the equal protection of the laws,
> or of equal privileges and immunities under the laws; or for the
> purpose of preventing or hindering the constituted authorities
> of any State or Territory from giving or securing to all persons
> within such State or Territory the equal protection of the laws;
> .... in any case of conspiracy set forth in this section, if one or
> more persons engaged therein do, or cause to be done, any act
> in furtherance of the object of such conspiracy, whereby
> another is injured in his person or property, or deprived of
> having and exercising any right or privilege of a citizen of the
> United States, the party so injured or deprived may have an
> action for the recovery of damages occasioned by such injury
> or deprivation, against any one or more of the conspirators.

259.   As set forth above, Plaintiff has alleged a conspiracy among the

Defendants.

260.   Plaintiff, whose principal is African American, has been deprived of

the equal protection of the laws because of racial animus and discrimination

directed against Plaintiff because of this racial animus, bias and prejudice against

African Americans.

{01748976;v1}

261.   The conspiracy among the Defendants was motivated by this racial discriminatory animus to deprive it, directly or indirectly, of the equal protection of the laws.

262.    As set forth above, Defendants have committed numerous acts in furtherance of this conspiracy.

263.   As a direct result of the foregoing, Plaintiff has suffered the deprivation of its rights and privileges.

264.   Defendants have deprived Plaintiff of its rights, privileges and/or immunities under federal law and/or the United States Constitution, that occurred under color of state law.

265.   As a result thereof, Plaintiff has suffered the $4,200,000 in damages.

266.   But for Defendants' racial animus, bias and prejudice in carrying out the acts, Plaintiff's contract with the VA would not have been terminated, and Plaintiff would also not have suffered$4,200,000 in damages.

267.   Defendants acted knowingly, wantonly, outrageously, and/or with reckless or callous indifference in taking the foregoing actions to deprive Plaintiff of its rights.

268.   Wherefore, Plaintiff Western-Star Hospital Authority, Inc. t/d/b/a Metro-Health, EMS  demands judgment in its favor and against all Defendants in

{01748976;v1}

57

the amount of $4,200,000, plus attorneys' fees, costs, interest, punitive damages, and any other relief that this Honorable Court deems just and proper.

269.   Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

Wherefore, Plaintiff Western-Star Hospital Authority, Inc. t/d/b/a Metro-Health, EMS demands judgment in its favor and against all Defendants in the amount of $4,200,000 plus attorneys' fees, costs, interest, punitive damages, and any other relief that this Honorable Court deems just and proper.

### Count III
### Intentional Interference with Contractual Relations
### Plaintiff v. All Defendants

270.   Plaintiff incorporates paragraph 1 through 269 above as if fully set forth herein at length.

271.   As set forth above, Plaintiff had a contract with the VA.

272.   As set forth above, Defendants took purposeful action specifically intended to harm the existing contractual relationship, and/or to prevent the contract from proceeding in the future.

273.   Defendants had no privilege or justification for their actions.

274.   Their actions resulted in legal damages to Plaintiff.

275.   As a result thereof, Plaintiff has suffered $4,200,000 in damages.

{01748976;v1}

276.   Defendants acted knowingly, wantonly, outrageously, and/or with reckless or callous indifference in interfering with Plaintiff's contract.

277.   Plaintiff is further entitled to attorney's fees and costs pursuant to 42 U.S.C. § 1988(b).

Wherefore, Plaintiff Western-Star Hospital Authority, Inc. t/d/b/a Metro-Health, EMS demands judgment in its favor and against all Defendants in the amount of $4,200,000 plus attorneys' fees, costs, interest, punitive damages, and any other relief that this Honorable Court deems just and proper.

**Count IV**
**Civil Conspiracy**
**Plaintiff v. All Defendants**

278.   Plaintiff incorporates paragraph 1 through 277 above as if fully set forth herein at length.

279.   As set forth above, Defendants combined and agreed to unlawfully interfere with Plaintiff's contract with the VA.

280.   The conspiracy began by at least 2017 and continued through at least the contract termination.

281.   As detailed above, Defendants engaged in numerous overt acts to further the conspiracy.

{01748976;v1}

282.   Plaintiff has suffered damages as a direct result of Defendants'
conspiracy and their overt acts taken in connection with the conspiracy to interfere
with Plaintiff's contractual relations.

283.   As a direct result thereof, Plaintiff has suffered $4,200,000 in damages.

284.   Defendants acted knowingly, wantonly, outrageously, and/or with
reckless or callous indifference in interfering with Plaintiff's contract.

285.   Wherefore, Plaintiff Western-Star Hospital Authority, Inc. t/d/b/a
Metro-Health, EMS demands judgment in its favor and against all Defendants in the

amount of $4,200,000, plus attorneys' fees, costs, interest, punitive damages, and any other relief that this Honorable Court deems just and proper.

Respectfully submitted,

FINEMAN KREKSTEIN & HARRIS, P.C.

By:    */s/ Mary Platt*_____
Mary Platt, Esquire
Attorney I.D. No. 31385
Ten Penn Center 1801 Market Street – Suite 1100
Philadelphia, PA  19103
215-893-9300