**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| WESTERN STAR HOSPITAL | : | |
| AUTHORITY INC., trading and doing | : | |
| business as METRO HEALTH EMS, | : | No. 1:21-cv-00524 |
|     Plaintiff | : | |
| | : | (Judge Kane) |
|         v. | : | |
| | : | |
| SUSAN MCCAFFREY, <u>et al.</u>, | : | |
|     Defendants | : | |

## <u>MEMORANDUM</u>

Plaintiff Western Star Hospital Authority, Inc., trading and doing business as Metro Health EMS ("Plaintiff"), is an emergency medical response transportation company. (Doc. No. 1.) It commenced this action on March 22, 2021, alleging that the thirteen named defendants (collectively, "Defendants") conspired to thwart, interfere with, and undermine a 2016 contract ("Contract") between Plaintiff and the United States Department of Veterans Affairs Pittsburgh Healthcare System ("VA") because Plaintiff is owned and operated by an African American. (Id.) Plaintiff alleges that Defendants' conduct resulted in the VA's termination of the Contract in 2019. (Id.) Plaintiff maintains that "[b]ut for Defendants' racial animus, bias and prejudice in carrying out the acts, Plaintiff's contract with the VA would not have been terminated." (Id. ¶ 253.) By five separate motions, Defendants move to dismiss the claims against them. (Doc. Nos. 36-38, 52, 63.) The Court will grant the motions but also grant, in part, leave to amend.

## I.    BACKGROUND[1]

The allegations in Plaintiff's complaint span three years, beginning in March 2016, when

---

[1] This background is drawn from the allegations in Plaintiff's complaint, which the Court has accepted as true, as well as exhibits attached to the complaint and matters incorporated by reference or integral to the complaint. <u>See</u> <u>Lum v. Bank of Am.</u>, 361 F.3d 217, 221 n.3 (3d Cir. 2004); <u>see also</u> <u>Mayer v. Belichick</u>, 605 F.3d 223, 230 (3d Cir. 2010).

the VA solicited bids for a contract (the "Contract") for the provision of ambulance and paramedic services for Pittsburgh and surrounding areas, and ending with the VA's termination of the Contract on March 21, 2019.  Before turning to the events underlying Plaintiff's alleged claims, the Court sets forth the numerous parties to this action.

### A.    The Parties

#### 1.    Plaintiff

Plaintiff is an emergency transportation company that provides basic life support and advanced life support ambulatory services to the greater Pittsburgh area.  (Id. ¶ 1.)  "B. Lamont Doyle, Chief Operating Officer of Plaintiff Metro-Health EMS, is of African American descent," and, "[i]n that regard, Plaintiff is owned and operated by minorities."  (Id. ¶¶ 3-4.)

#### 2.    The VA Defendants

Plaintiff brings suit against five VA staff members (collectively, the "VA Defendants"): (1) Susan  McCaffrey ("McCaffrey"), Vice President of Facilities Management; (2) Laura Baumgart ("Baumgart"), Executive Assistant to the Director of the VA; (3) Barbara Forsha ("Forsha"), Deputy Director of Healthcare for the VA; (4) Robert Schollaert ("Schollaert"), Supervisory Program Specialist; and (5) David Utter ("Utter"), Transportation and Fleet Operations Manager.  (Id. ¶ 5-14.)

#### 3.    The UPMC Defendants

Defendant University of Pittsburgh Medical Center ("UPMC") is a Pittsburgh-based healthcare provider and insurer that operates numerous hospitals in Pennsylvania.  (Id. ¶¶ 16-18.) Defendant UPMC Medcall runs a program known as "'Medcall a/k/a 'PARC,'" an ambulance brokerage service for all UPMC-run facilities.  (Id. ¶¶ 19-20.)  Plaintiff refers to Defendants UPMC and UPMC Medcall collectively as "UPMC/PARC" throughout its complaint, and the Court will follow the same naming convention.  UPMC/PARC receives incoming calls from

patients in need of non-emergency transportation services and assigns the call to one of several Emergency Medical Technicians ("EMT") companies with which it partners.   (Id. ¶ 21.) Defendant Myron Rickens ("Rickens," and with UPMC/PARC, the "UPMC Defendants") is UPMC's director, as well as a member of EMSW's board of directors.  (Id. ¶¶ 56-57.)

### 4.     Medevac Ambulance Service

Defendant Medevac Ambulance Service ("MAC"), a division of Pennsylvania Medical Transport, Inc., is an ambulance company owned by nonparty Edward Heltman.  (Id. ¶¶ 22-23.) UPMC/PARC retained MAC to "perform services as staff/paramedics," and, in that capacity, at all times relevant to this action, MAC served as the staffing agent for VA hospitals in Pittsburgh and surrounding areas.  (Id. ¶¶ 24-25.)

### 5.     The Commonwealth Defendants

Defendants Aaron Rhone ("Rhone") and Travis Woodward ("Woodward," and with Rhone, the "Commonwealth Defendants") are employees of the Pennsylvania Department of Health ("DOH")'s Bureau of Emergency Medical Services ("BEMS").  (Id. ¶¶ 27, 29.)  Rhone is BEMS' Emergency Medical System Services ("EMS") Program Manager, and Woodyard is a BEMS' Program Specialist.  (Id. ¶¶ 27, 29.)  BEMS regulates Pennsylvania's EMS system, which was established pursuant to the Emergency Medical Services Systems Act ("EMSS Act"), 35 Pa. C.S.A. §§ 8101-8157.  (Doc. No. 1 ¶ 37.)  BEMS is responsible for, among other things, "licensing all EMS agencies and all prehospital care providers in the Commonwealth" (id. ¶ 31). It "achieves its central mission . . . through a number of statutorily mandated tasks, e.g., transportation and coordination."  (Id. ¶ 41.)

### 6.     The EMSW Defendants

Defendants Brian Shaw ("Shaw") and Amos Cameron ("Cameron," and with Shaw, the "EMSW Defendants") are employed by Emergency Medical Services West ("EMSW"), one of

several regional EMS councils employed by BEMS to carry out its regulatory functions pursuant to the EMSS Act.  (Id. ¶¶ 38, 33.)  Shaw is EMSW's Deputy Director, and Cameron is an EMSW inspector.  (Id. ¶¶ 33, 36.)  Regional councils such as EMSW "have been delegated public functions in the Commonwealth's EMS management" (id. ¶ 50) and "perform[] inspections and licensing, traditional government functions," pursuant to Commonwealth's EMS system (id. ¶ 52).

### B.  Allegations Underlying Plaintiff's Claims

Having set out the relevant parties to this action, the Court turns to the facts underlying Plaintiff's complaint.  Plaintiff's allegations span roughly three periods of time: (1) allegations of conduct leading up to the formation of the Contract between the VA and Plaintiff ("pre-contract-formation allegations"); (2) allegations of conduct that occurred while the Contract was in existence ("post-contract-formation allegations"); and (3) allegations regarding events postdating the termination of the Contract ("post-contract-termination allegations").  Before laying out the allegations in the complaint, the Court notes that Plaintiff's allegations scarcely reference specific dates or even periods of time related to the allegations, and many of the allegations are not in chronological order.  It is for that reason that the Court's recitation of the allegations in the complaint largely lacks any specific dates or date ranges.

### 1.  Pre-Contract-Formation Allegations (2016)

In March 2016, the VA solicited bids for a contract ("Contract") for ambulance and paramedic services in Pittsburgh and surrounding areas.  (Id. ¶ 64.)  At the time, Defendant UPMC/PARC, through Defendant MAC, provided those services to VA hospitals in the same region.  (Id. ¶ 65.)  Plaintiff was the only contractor that submitted a bid for the Contract.  (Id. ¶ 66.)  Defendant Utter of the VA reviewed and rejected the bid "faster than he had ever reviewed and/or rejected a bid submitted by any contractor," indicating either that he did not review it "or

gave it only a cursory and inadequate review with the intent" of rejecting because Plaintiff is

minority-owned and -operated.  (Id. ¶¶ 70-71.)  The VA canceled the solicitation and resumed

using UPMC/PARC and MAC to service the region's hospitals.  (Id. ¶ 72.)

      In August 2016, the VA reissued the solicitation, and Plaintiff submitted a bid and related

application.  (Id. ¶¶ 73-74.)  Plaintiff alleges that EMSW licensing manager Scott Crawford

("Crawford")—based on agreements between and among the EMSW Defendants, UPMC/PARC,

and MAC—delayed submission of Plaintiff's application for "utterly meritless reasons" at "the

behest of [the EMSW Defendants]."  (Id. ¶¶ 76-77.)  Subsequently, Crawford rejected the

application for illegitimate reasons, including the failure to capitalize a street name and city.  (Id.

¶¶ 78-79.)  When Plaintiff resubmitted the application to correct those purported deficiencies,

Crawford, encouraged by the EMSW Defendants, rejected the application, but for different

reasons, further delaying the application process.  (Id. ¶ 80-82.)  Eventually, in December 2016,

EMSW approved Plaintiff's application and the VA awarded Plaintiff the Contract.  (Id. ¶¶ 84-

85.)  Plaintiff was "the first company owned by an African American to secure a contract for

ambulances services of this magnitude with the VA for the Pittsburgh area."  (Id. ¶ 62.)

### 2.  Post-Contract-Formation Allegations (2016 to 2019)

      After it "secured the Contract and throughout the Contract," Plaintiff alleges that

"Defendants Utter, Shaw, Cameron and Rickens, individually and/or in concert, acting in their

individual and not official capacities, along with UPMC/PARC and MAC developed and/or

participated in several schemes to interfere with and/or undermine the Contract because of racial

bias and prejudice toward Plaintiff."  (Id. ¶ 86.)  At the start, Utter allegedly advised Rickens that

he could prolong MAC's role as the regional provider of ambulance and paramedic services by

ensuring that Plaintiff failed equipment inspections.  (Id. ¶ 87.)  Utter was not in charge of

inspections and must have "had to secure" the assistance of EMSW, the Commonwealth, and the

DOH, and "officials or employees associated with those entities."  (Id. ¶¶ 88-90.)

At some point thereafter, Rickens and the EMSW Defendants obtained information from the VA, including from Utter, relating to Plaintiff's responsibilities under the Contract and began "inspecting Plaintiff's vehicles and equipment."  (Id. ¶ 93.)  In January and February 2017, the EMSW Defendants (Cameron and Shaw), with Rickens' help, "inspected and/or directed others to inspect Plaintiff's vehicles" on three (3) occasions and failed the vehicles each time.  (Id. ¶¶ 94-95.)  The failures were allegedly fabricated by the EMSW Defendants and related to "items that, under normal circumstances, would not have resulted in the failure of the equipment."  (Id. ¶ 96.)  Plaintiff cites as an example that "several pieces of equipment that [the EMSW Defendants] labeled as 'not working' following [a] January 24, 2017 inspection were marked as 'working' during [a] February 6, 2017 inspection, although Plaintiff had not repaired the equipment in between the two (2) inspections."  (Id. ¶ 98.)

Around the same time, although unclear when, Plaintiff alleges that another EMSW inspector stated to Plaintiff: "I don't understand how you guys failed inspection.  I've never seen or heard of a company failing inspection."  (Id. ¶ 100.)  A BEMS' ambulance licensure coordinator reportedly made a similar comment.  (Id. ¶ 102.)  During one inspection, Smith passed one of Plaintiff's vehicles, directly after which Defendant Shaw failed the same vehicle.  (Id. ¶ 101.)  Plaintiff avers that EMSW had never before failed a provider of ambulance and paramedic services for similar violations.  (Id. ¶ 103.)  Plaintiff contacted the Commonwealth Defendants (Rhone and Woodward) to report a "conflict of interest and racial animus," reporting that EMSW board members, along with Rickens and MAC's owner, Heltman, "hired, managed, and/or operated MAC."  (Id. ¶¶ 104-05.)  The Commonwealth Defendants took no action.  (Id. ¶ 106.)  They instead contacted a VA contract specialist, Keith Watson ("COR Watson"), and

contracting officer to obtain information relating to the Contract.  (Id. ¶ 107).

Following the failed inspections, sometime in early 2017, EMSW issued Plaintiff a restricted license "due to the [] 'failures' for which [EMSW] cited Plaintiff."  (Id. ¶¶ 108-09.) Although "Plaintiff was slated to begin the work under the Contract in January 2017," it did not commence work until late February 2017.  (Id. ¶ 112.)  MAC continued to service VA hospitals and did so until March 1, 2016, when EMSW issued Plaintiff a full license.  (Id. ¶ 115.) Plaintiff broadly alleges that Utter, the Commonwealth Defendants, and the EMSW Defendants, "individually and/or in concert," subsequently conspired to impose upon Plaintiff "unreasonable and unprecedented restrictions and/or requirements."  (Id. ¶ 116.)  At some point, Plaintiff was advised, for the first time, that its vehicles were required to have radio communications capability with Allegheny County EMS Dispatch—in response, the County indicated that they could not provide that access, and that that no other private ambulance companies in the area had access to its radio frequency.  (Id. ¶¶ 117-19.)

Sometime in or around March 2017, "for the first time in the history of the administration of the Contract," senior VA officials—including the VA Defendants (McCaffrey, Forsha, Schollaert, Baumgart, and Utter)—"participated in the day-to-day operations of the administration of the Contract."  (Id. ¶ 121.)  The VA Defendants then formed an "Oversight Committee" (or "Committee") to collect data to "undermine and/or terminate the Contract because of racial animus, bias and prejudice."  (Id. ¶ 122.)  Committee members allegedly: (1) "informed VA staff members that Plaintiff was an African American owned company"; (2) "instructed VA staff members to document Plaintiff's performance of the Contract and bring it back to the Oversight Committee"; and (3) "informed VA staff members that they wanted 'bad data not good data.'"  (Id. ¶¶ 122-25.)  Forsha stated to VA staff members: "Plaintiff is

'minority-owned . . . I want a weekly [report on its] performance. I want to know the bad not the

good.'" (Id. ¶ 126) (alterations in original).  Committee members also told VA staff to "let them

know every time Plaintiff was late so they could fine Plaintiff and reduce its pay." (Id. ¶ 128.)

Thereafter, VA staff began "checking watches and clocks" when Plaintiff picked up and dropped

off patients. (Id. ¶ 129.)  The VA had subjected neither the "majority-owned UPMC/PARC and

MAC" nor Transcare, a "majority-owned"[2] company that had serviced the VA, to the same

scrutiny. (Id. ¶¶ 132-33.)  Committee members threatened VA staff members who failed to

scrutinize Plaintiff's work and report deficiencies, and Defendant Baumgart stated, "low lying

fruit go first." (Id. ¶¶ 130-31.)  The Committee was hostile to VA employees who sympathized

with Plaintiff, "orchestrat[ing] the transfer of some VA employees to other

departments/positions, and subject[ing] others to sexual harassment allegations." (Id. ¶ 146.)

Plaintiff alleges that unnamed VA staff members were aware that the Committee

"imposed this heightened scrutiny because Plaintiff is black owned." (Id. ¶ 135.)  In this regard,

VA staff members purportedly told Plaintiff that they were instructed to "report anything you

guys [Plaintiff] do," asked Plaintiff if it was minority-owned, and informed Plaintiff, "[w]e are

watching [your] times.  We pay you all a lot and money and you're black-owned, too." (Id. ¶¶

135-38.)  Unnamed management-level VA employees similarly commented: (1) Plaintiff "must

be black-owned because I [have] never seen a member of management act and send [so] many

email [messages about] ambulances being 5 or 10 minutes late"; (2) the hospital had waited

several hours for Transcare and UPMC/PARC ambulances, but management "never expressed

---

[2] "Majority-owned" is presumably intended to convey that these entities are <u>not</u> minority owned,
but because of the lack of clarity in the pleadings, the Court will use the terminology employed
in the complaint.

any concerns"; and (3) never in the VA's history had VA staff "experienced this level of interest from senior management in the operations of an ambulance contractor." (Id. ¶¶ 139-41.)  A former employee of Plaintiff who had worked for Transcare and MAC made similar comments, as did COR Watson.  (Id. ¶¶ 142-144.)

In early or mid-2017, UPMC/PARC and MAC directed its employees "stationed at VA hospitals" to "employ heightened checks and requirements on Plaintiff" by: (1) "delay[ing] calling Plaintiff for transportation services"; (2) "alter[ing] Plaintiff's logged response times"; and (3) "upgrad[ing] the call levels, to ensure that Plaintiff did not respond to calls timely and/or to ensure that Plaintiff did not present at the VA hospitals with the proper equipment." (Id. ¶¶ 147, 150, 153, 155.)[3] The VA Defendants were aware of this conduct and directed their own employees to continue engaging in similar conduct, "all to adversely affect Plaintiff's response time."  (Id. ¶¶ 151, 156-59.)  The VA Defendants, at some point, began requiring Plaintiff to meet with them on a weekly basis to review its performance, although the Contract did not require such meetings.  (Id. ¶¶ 165-67.)  The VA Defendants allowed UPMC/PARC and MAC representatives to participate in the meetings.  (Id. ¶ 168.)  Plaintiff avers that UPMC/PARC and MAC were never subjected to that requirement.  (Id. ¶ 170.)

Subsequently and/or contemporaneously therewith the above allegations, Defendants "caused EMSW to subject Plaintiff to an unprecedented number of 'spot' inspections."  (Id. ¶ 172.)  On March 16, 2017, the Commonwealth and EMSW Defendants positioned themselves in VA hospital garages to inspect Plaintiff's employees' identification cards and its vehicles and equipment.  (Id. ¶¶ 172-176.)  When the Commonwealth Defendants learned that another private

---

[3] Plaintiff alleges that this conduct continued throughout the Contract, but its allegations do not indicate when, how, or who of the Defendants persisted with such conduct.

ambulance company, Priority One, was assisting Plaintiff with satisfying its obligations under the Contract, they retaliated by conducting an unannounced and unprecedented inspection of Priority One's licenses.  (Id. ¶¶ 178-82.)  The Commonwealth and EMSW Defendants conducted another spot inspection in May 2017 and, although they did not cite Plaintiff for any violations, did so "in such a hostile manner that five (5) of Plaintiff's employees quit[] immediately thereafter."  (Id. ¶¶ 184-86.)

 "Sometime thereafter," the EMSW Defendants inspected one of Plaintiff's vehicles, determined that Plaintiff "did not have the Allegheny radio frequency," and suspended its license, shutting down all of its operations for one week.  (Id. ¶¶ 187-90.)  The EMSW Defendants then "declared" that EMSW "would have to inspect all of Plaintiff's ambulances before [it] could recertify Plaintiff."  (Id. ¶ 190.)  Plaintiff avers that the EMSW Defendants, by "or at the direction" of the Commonwealth Defendants, delayed in scheduling the needed inspections.  (Id. ¶ 193.)  "[A]ll of the violations [were dismissed] as meritless."  (Id. ¶¶ 198-99.)  Plaintiff alleges that EMSW West "had not conducted spot inspections of the ambulances of any [other] providers in years."  (Id. ¶¶ 195-97.)  Plaintiff at one point complained to the VA Defendants and COR Watson that UPMC/PARC and MAC were attempting to undermine the Contract out "so that Plaintiff would fail to perform and/or the VA would terminate the Contract."  (Id. ¶¶ 202-03.)  The VA Defendants allegedly took no action.  (Id. ¶ 204.)  A VA contract specialist reported her concerns about discriminatory conduct to the VA Office of Inspector General.  (Id. ¶ 207.)

 In or around 2018 and 2019—"as a part of the same conspiracy and concerted action among [the VA Defendants], along with UPMC/PARC and MAC[,] to interfere with and/or undermine the Contract so that Plaintiff would fail to perform and/or the VA would terminate"

the Contract—all Defendants "imposed unreasonable and unprecedented restrictions and/or requirements on Plaintiff, causing Plaintiff to continue experiencing (1) delayed calls; (2) altered logged response times; and (3) last minute or belated upgraded call levels."  (Id. ¶ 207.)  The VA Defendants "continued to employ the unprecedented heightened scrutiny of Plaintiff's performance."  (Id. ¶¶ 208-10.)  Additionally, unnamed VA employees, at the best of the VA Defendants, UPMC/PARC, and MAC, falsely accused Plaintiff of "cheating the government" and "of misrepresenting the identity of its Medical Director."  (Id. ¶¶ 212-13.)  VA and DOH representatives called the medical director about Plaintiff so many times that it interfered with his private medical practice, precipitating the medical director's resignation, forcing Plaintiff to find a replacement.  (Id. ¶¶ 214-16, 218.)  Plaintiff avers that "the calls were made by and/or at the direction and/or instruction of Defendants McCaffrey, Forsha, Schollaert, Baumgart, Utter, Rhone, Shaw and/or Cameron, individually and/or in concert, acting in their individual and not official capacities, along with UPMC and MAC and as part of the same conspiracy described herein."  (Id. ¶ 216.)

In March 2019, VA Defendant Schollaert, in concert with all other Defendants, accessed a website containing a DOH EMS portal in order to investigate the status of the licenses of Plaintiff's paramedics.  (Id. ¶¶ 219-20.)  The website inaccurately reported that one paramedic's license was expired, and on Friday, March 15, 2019, Schollaert contacted Plaintiff inquiring "about the status of the licenses/certifications of its paramedics."  (Id. ¶¶ 221-22.)  Plaintiff's owner and operator assured Schollaert that its paramedics' licenses and certifications were current and indicated that he would submit proof the following Monday.  (Id. ¶¶ 223-24.)  Plaintiff avers that Schollaert did not wait for proof and instead forwarded a "memorandum [] to all relevant VA departments of transportation . . . direct[ing] the personnel to refrain from

sending any calls for transport to Plaintiff." (Id. ¶¶ 225-26.)  The VA Defendants allegedly knew the information posted on the website was false and "used it to advance the conspiracy." (Id. ¶ 228.)

Plaintiff received no calls for transport from the evening of Friday, March 15, 2019, to Sunday, March 17, 2019. (Id. ¶ 227.)  When Plaintiff inquired as to why it had not received any calls for that period of time, Cynthia Grygier, the VA's Contracting Officer at the time, "advised Plaintiff that the VA had terminated the Contract, effective March 21, 2019, for the 'convenience' of the government." (Id. ¶ 230.)

### 3.   Post-Contract-Termination Allegations (2019)

In August 2019, following its termination of the Contract, the VA "issued a solicitation for the exact services it contracted with Plaintiff to perform," and it reissued the same solicitation one month later. (Id. ¶¶ 232-33.)  Plaintiff alleges that "the VA did not award the Contract to a company owned and/or operated by an African American." (Id. ¶ 234.)

In a December 2019 decision, Richard J. Anzelone ("Anzelone"), a VA Branch Chief and Contracting Officer, set forth the following reasons for which the VA terminated the Contract: (1) "[f]rom the beginning of contract performance, the [COR] in Pittsburgh received complaints about [Plaintiff's] performance"; and (2) "[Plaintiff] had problems with safety and credentialing, to include no medical command discovered in June 2018 and expired PA EMS certificates of employees from December 2018 through March 2019." (Id. ¶¶ 235-37.)  Plaintiff alleges that the "safety and credentialing" problems were based on false reports and resulted from "extraordinary and unwarranted inspections" and repeated and unwarranted checks on Plaintiff's operations. (Id. ¶¶ 238-39.)

### 4.   Allegations of an Overarching Conspiracy and/or Concerted Action

Not included in the recitation of the factual allegations above are the numerous

conclusory, redundant, and overlapping assertions concerning an alleged conspiracy or concerted

effort on the part of the thirteen named Defendants to undermine the Contract because Plaintiff is

minority-owned and -operated.  (Doc. No. 1 ¶¶ 63, 86, 91-92, 110-11, 116, 120, 134, 146, 148-

49, 152, 160, 164, 171, 177, 179, 181, 183, 191-92, 201, 205, 217, 220, 231, 241, 243-45, 250,

261-62.)  An example of such a conclusory assertion is provided below:

> Because an African American owns Plaintiff, during the application process and
> throughout the life of the Contract, Defendants McCaffrey, Forsha, Schollaert,
> Utter, Shaw and Cameron, individually and/or in concert, acting in their individual
> and not official capacities, along with UPMC and Rickens and Darby of Defendant
> UPMC's PARC program . . . and Heltman and Joseph of MAC, interfered with the
> Contract and/or conspired with one another to undermine Plaintiff's Contract with
> the VA and to deprive Plaintiff of its rights under the Contract, as well as its
> Constitutional rights.

(Id. ¶ 63.)

C.    **Procedural History**

Plaintiff commenced this action on March 22, 2021, seeking to recover over $4,200,000

in damages stemming from Defendants' conduct from late 2016 until early 2019.  (Doc. No. 1 ¶¶

252, 265, 275, 283.)  Plaintiff asserts the same four counts against all five Defendants, namely:

(1) equal protection violations under 42 U.S.C. §§ 1981 and 1983 (Count I); (2) equal protection

violations under 42 U.S.C. §§ 1983 and 1985 (Count II); (3) state law claims for intentional

interference with contractual relations (Count III); and (4) state law civil conspiracy claims

(Count IV).[4]

The UPMC, Commonwealth, and EMSW Defendants filed their motions to dismiss on

June 28, 2021 (Doc. Nos. 36-38), Defendant MAC filed its motion to dismiss on July 14, 2021

---

[4] Plaintiff's complaint asserts no legal basis in support of Count IV aside from labeling it "civil conspiracy."  (Doc. No. 1 ¶¶ 278-85.)  Nevertheless, Plaintiff's briefing clarifies that Count IV is based on "state common law."  (Doc. Nos. 56 at 30, 73 at 33.)

(Doc. No. 52), and the VA Defendants filed their motion to dismiss on August 27, 2021 (Doc.

No. 63).  Between June and September 2021, Defendants filed briefs in support of their

respective motions to dismiss.  (Doc. Nos. 39-41, 53, 66.)  In the interim, in July 2021, Plaintiff

filed briefs in opposition to the motions filed by the UPMC Defendants (Doc. No. 49), the

Commonwealth Defendants (Doc. No. 56), the EMSW Defendants (Doc. No. 48), and Defendant

MAC (Doc. No. 59), and those Defendants filed reply briefs (Doc. Nos. 57-58, 60, 61).  Plaintiff

filed a brief in opposition to the VA Defendants' motion to dismiss on October 15, 2021 (Doc.

No. 73), and the VA Defendants filed a reply brief on November 8, 2021 (Doc. No. 77).

During the parties' briefing of the pending motions, the Court granted various extensions

and permitted the parties to file briefs in excess of page and word limits set forth in Local Rule

7.8(a).  (Doc. Nos. 46-47, 51, 55, 65, 71, 75-76.)  The Court also received a supplemental brief

from counsel for all Defendants.  (Doc. No. 67.)   Having been fully briefed, Defendants'

motions (Doc. Nos. 36-38, 52, 63) are ripe for disposition.

## II.    LEGAL STANDARDS

All Defendants move to dismiss the claims against them for failure to state a claim upon

which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6).  (Doc. Nos. 39-

41, 53, 66.)  The VA Defendants additionally move to dismiss Plaintiff's claims for lack of

jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1).  (Doc. No. 73.)  The relevant

legal standards are set forth below.

### A.    Rule 12(b)(6) Legal Standard

Federal notice and pleading rules require the complaint to provide the defendant notice of

the claim and the grounds upon which it rests.  See Phillips v. Cnty. of Allegheny, 515 F.3d 224,

232 (3d Cir. 2008).  When reviewing the sufficiency of a complaint pursuant to a motion to

dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true all material allegations in the complaint and all reasonable inferences that can be drawn from them, viewed in the light most favorable to the plaintiff.  See In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 314 (3d Cir. 2010).  However, the Court need not accept legal conclusions proffered as factual allegations.  See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  Rather, a civil complaint must "set out 'sufficient factual matter' to show that the claim is facially plausible." See Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

Consistent with the Supreme Court's rulings in Twombly and Iqbal, the Third Circuit has identified three steps a district court must take when determining the sufficiency of a complaint under Rule 12(b)(6): (1) identify the elements a plaintiff must plead to state a claim; (2) identify any conclusory allegations contained in the complaint "not entitled" to the assumption of truth; and (3) determine whether any "well-pleaded factual allegations" contained in the complaint "plausibly give rise to an entitlement to relief."  See Santiago v. Warminster Twp., 629 F.3d 121, 130 (3d Cir. 2010) (internal quotation marks omitted).  A complaint is properly dismissed where the factual content in the complaint does not allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  See Iqbal, 556 U.S. at 678.

### B.      Rule 12(b)(1) Standard

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss an action for lack of subject matter jurisdiction.  Once the Court's subject matter jurisdiction over a complaint is challenged, the plaintiff bears the burden of proving that jurisdiction exists.  See Mortensen v. First Fed. Sav. and Loan Ass'n, 549 F.2d 884, 891 (3d Cir. 1977).  In a factual challenge to the Court's subject matter jurisdiction, such as the challenge raised by the VA Defendants here, the

Court is not confined to the allegations of the complaint, and the presumption of truthfulness does not attach to the allegations as with a Rule 12(b)(6) motion to dismiss.  See Mortensen, 549 F.2d at 891.  The Court may consider evidence outside the pleadings, including affidavits, depositions, and testimony, to resolve any factual issues bearing on jurisdiction.  See Gotha v. United States, 115 F.3d 176, 179 (3d Cir. 1997).

## III.    DISCUSSION

Plaintiff asserts, against all Defendants, federal civil rights claims pursuant to 42 U.S.C. §§ 1981 and 1983 (Count I) and 42 U.S.C. §§ 1983 and 1985 (Count II), along with state law contract and conspiracy claims (Counts III & IV).  Underlying each claim are allegations of an overarching conspiracy and/or concerted action.  The motions to dismiss filed by the EMSW, UPMC/PARC, Commonwealth, and MAC Defendants are based on similar contentions—i.e., a statute of limitations defense—and subject to essentially the same analysis.  As such, the Court will refer to those eight (8) Defendants collectively as the "Non-Federal Defendants" to differentiate them from the VA Defendants, whose arguments stand on different footing and who did not raise a statute of limitations defense in their opening brief.[5]

### A.    Overarching Pleading Deficiencies

As acknowledged throughout Defendants' briefing, Plaintiff's complaint in its current form presents numerous obstacles to the Court's determination of the sufficiency of its claims.  It is therefore not surprising that some Defendants seek an order directing Plaintiff to provide a more definite pleading pursuant to Federal Rule of Civil Procedure 12(e).  (Doc. No. 39 at 18.)  The convoluted nature of Plaintiff's complaint, the lack of specific dates, the length and

---

[5] As Plaintiff notes, the VA Defendants' failure to raise the statute of limitations defense in their opening brief constitutes a waiver of the right to assert that contention.

redundancy of its allegations, the overlapping and alternative bases asserted as grounds for liability, and the inclusion of multiple, alternatively implicated Defendants within the same paragraphs challenge the Court and Defendants to parse fact from legal conclusion, and to assess the claims under the applicable law.  This is particularly true given Plaintiff's conclusory conspiracy-based claims, which require particularized allegations addressing the time periods of the conspiracy and the specific actions of each alleged conspirator to achieve the object of the conspiracy, see infra.

Nevertheless, and despite the shortcomings of Plaintiff's pleadings, the Court's review and assessment of the complaint—assuming the truth of the allegations therein—compels the conclusion that: (1) Count II is time-barred as against all of the Non-Federal Defendants; and (2) the Court lacks subject matter jurisdiction to hear the claims against the VA Defendants, see infra.  Because the disposition of those claims substantially narrows the scope of Plaintiff's complaint,[6] and in light of the conclusory and convoluted nature of allegations underlying any remaining claims (i.e., Count I), the Court will grant the Defendants' motions to dismiss in their entirety but afford Plaintiff leave to amend its complaint as to Count I insofar as it is asserted against the Non-Federal Defendants.  The Court turns to Plaintiff's federal civil rights claims.

### B.      Counts I & II as to the Non-Federal Defendants

Plaintiff asserts its § 1981 (Count I) and § 1985 (Count II) claims pursuant to § 1983. Section 1983 is the vehicle by which private citizens can seek redress for violations of federal constitutional rights committed by state officials.  See 42 U.S.C. § 1983.  The statute provides, in relevant part:

Every person who, under color of any statute, ordinance, regulation, custom, or

---

[6] Plaintiff has further circumscribed the scope of its claims by withdrawing Counts III and IV as against the VA and Commonwealth Defendants.  (Doc. Nos. 56 at 30, 73 at 33.)

usage, of any State or Territory or the District of Colombia, subject, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

See id. Section 1983 "does not . . . create substantive rights; it provides only remedies for deprivations of rights established elsewhere in the Constitution or federal laws." See Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a claim for relief under § 1983, a plaintiff "must allege the violation of a right secured by the Constitution and laws of the United States" and "show that the alleged deprivation was committed by a person acting under color of state law." See Harvey v. Plains Twp. Police Dep't, 421 F.3d 185, 189 (3d Cir. 2005) (quoting West v. Atkins, 487 U.S. 42, 48 (1988)).

### 1.      Timeliness of Counts I & II as to the Non-Federal Defendants

As the Court noted above, the Non-Federal Defendants move to dismiss Plaintiff's claims as time-barred under the applicable statutes of limitations. While the Court has concluded that it will grant Plaintiff leave to amend its complaint as to its claims asserted against the Non-Federal Defendants in Count I, see supra, most of the Non-Federal Defendants contend that all of the claims asserted in Count I are time-barred and should be dismissed with prejudice. For that reason, the Court will briefly address the timeliness of those claims before addressing the timeliness of the claims asserted against the Non-Federal Defendants in Count II.

### a.      Applicable Legal Standard

A "complaint is subject to dismissal for failure to state a claim on statute of limitations grounds only when the statute of limitations defense is apparent on the face of the complaint." See Wisniewski v. Fisher, 857 F.3d 152, 157 (3d Cir. 2017). Statutes of limitations "run[] from the moment that a claim accrues." See Nguyen v. Pennsylvania, 906 F.3d 271, 273 (3d Cir. 2018). Federal claims accrue, and the limitations period commences, "when the plaintiff has 'a

18

complete and present cause of action'" and "can file suit and obtain relief." See Bay Area

Laundry & Dry Cleaning Pension Tr. Fund v. Ferbar Corp. of California, 522 U.S. 192, 201

(1997) (quoting Rawlings v. Ray, 312 U.S. 96, 98 (1941)).  Thus, a "section 1983 cause of action

accrues when the plaintiff knew or should have known of the injury upon which its action is

based." See Sameric Corp. of Delaware v. City of Philadelphia, 142 F.3d 582, 599 (3d Cir.

1998).

 Conspiracy claims similarly accrue upon "each overt act causing damage." See Wells v.

Rockefeller, 728 F.2d 209, 217 (3d Cir. 1984).  To state a timely conspiracy claim, Plaintiff must

allege that a defendant-conspirator "commit[ted] . . . overt acts in furtherance of the alleged

conspiracy within the applicable two-year limitations period." See Arneault v. O'Toole, 864 F.

Supp. 2d 361, 408 (W.D. Pa. 2012), aff'd on other grounds, 513 F. App'x 195 (3d Cir. 2013); see

also Seawright v. Greenberg, 233 F. App'x 145, 149 (3d Cir. 2007) (unpublished) (finding

untimely a plaintiff's claims where she did not allege "any conduct [against the defendant] that

occurred within the limitations period"); cf. Mandel v. M & Q Packaging Corp., 706 F.3d 157,

165-66 (3d Cir. 2013) (finding timely a hostile work environment claim where there was at least

one allegation within the limitations period against an individual who had allegedly harassed the

plaintiff prior to the limitation period's expiration).

  **b.** **Whether Plaintiff's §§ 1981/1983 Claims Are Time-Barred as**
    **to the Non-Federal Defendants (Count I)**

 Plaintiff asserts its claims in Count I pursuant to §§ 1981 and 1983.  Section 1983 claims

that arise in Pennsylvania are typically governed by the two-year statute of limitations provided

in 42 Pa. C.S.A. § 5524, see Kach v. Hose, 589 F.3d 626, 634 (3d Cir. 2009), but claims asserted

against state actors pursuant to § 1981 through § 1983 are subject to either: (1) Pennsylvania's

two-year limitations period for personal injury actions under 42 Pa. C.S.A. § 5524; or (2) the

federal catchall statute of limitations provided in 28 U.S.C. § 1658, see McCreary v. Redevelopment Auth. of City of Erie, 427 F. App'x 211, 214 (3d Cir. 2011) (unpublished) (citing Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004)).[7]  More specifically, causes of action based on discrimination in the formation of a contract are governed by Pennsylvania's two-year limitations period, whereas causes of action based on post-formation conduct are subject to the four-year federal catchall limitations period.  See id.; see also, e.g., McCreary, 427 F. App'x at 214; Hills, 978 F. Supp. 2d at 477.

Plaintiff commenced this action on March 22, 2021.  Therefore, to the extent that its claims in Count I are based on events that occurred after the formation of the Contract, the four-year statute of limitations provided in 28 U.S.C. § 1658 applies.  Thus, any post-contract-formation claims that accrued after March 22, 2017, are timely, and any claims that accrued prior to that date are time-barred unless an equitable exception applies.[8]  Contrary to the Non-Federal Defendants' contentions, Plaintiff has alleged conduct that falls within the four-year limitations period (March 2017 to March 2021) as to all but one of the UPMC Defendants (Rickens).

_____

[7] As numerous courts have noted, whether the two- or four-year limitations period applies "depend[s] on whether [the] claim 'would have been actionable under the pre-1991 version of § 1981.'"  See McCreary, 427 F. App'x at 214 (quoting Cross v. Home Depot, 390 F.3d 1283, 1289 (10th Cir. 2004)).  Prior to 1991, a plaintiff could bring a § 1981 claim based on conduct relating to the formation of a contract but could not bring a § 1981 claim based on conduct that occurred after a contract was formed.  See Cross, 390 F.3d at 1288; see also, e.g., McCreary, 427 F. App'x at 214; Hills v. Borough of Colwyn, 978 F. Supp. 2d 469, 477 (E.D. Pa. 2013) (citing Baker v. Birmingham Bd. of Educ., 531 F.3d 1336 (11th Cir. 2008) (collecting cases)).

[8] As to Plaintiff's allegations concerning pre-contract-formation conduct, which allegedly occurred between the VA's solicitation of a bid in late in March 2016 and its award of the Contract to Plaintiff in December 2016, any claims based on that conduct are subject to a two-year limitations period.  See Hills, 978 F. Supp. 2d at 477.  Accordingly, the limitations period as to those claims would have expired no later than December 2018 and appear to be time-barred given that Plaintiff did not commence this action until 2021.

Specifically, as to each Non-Federal Defendant excepting Rickens, Plaintiff asserts conduct that occurred after March 2017, i.e., within the four-year limitations period.  (Doc. No. 184-90, 193, 198, 200, 206).  The claims against them are therefore not untimely on the face of the complaint.

Regarding Rickens, the latest allegations asserted against him concern February 2017, which falls outside the four-year limitations period.  Thus, "Plaintiff's [c]omplaint [] [fails to] allege that [Rickens] committed an overt act in furtherance of the conspiracy causing injury to Plaintiff during the [four-year] period prior to the date Plaintiff filed the [c]omplaint."  See Wilson v. King, No. 06-cv-02608, 2010 WL 1071651, at *4 (E.D. Pa. Mar. 22, 2010).  The Court will nevertheless grant Plaintiff leave to amend its complaint as to the claims asserted in Count I against Rickens, which would not be futile or inequitable, particularly given Plaintiff's (albeit conclusory) allegations against all Defendants throughout the complaint.  In short, the Court will not grant the Non-Federal Defendants' request to dismiss Count I with prejudice for untimeliness, although it will dismiss Count I as to these Defendants for the pleading deficiencies outlined herein, supra & infra.

### c.   Whether Plaintiff's §§ 1983/1985 Claims Are Time-Barred as to the Non-Federal Defendants (Count II)

Count II of Plaintiff's complaint asserts conspiracy claims for civil rights violations under §§ 1983 and 1985.  The two-year limitations period that generally applies to § 1983 claims in Pennsylvania applies to conspiracy claims brought pursuant to §§ 1983 and 1985.  See Bougher v. Univ. of Pittsburgh, 882 F.2d 74, 80 (3d Cir. 1989).  Plaintiff maintains that its claims in Count II accrued when the VA terminated the contract on March 21, 2019, two years from which was March 21, 2021.  As Plaintiff notes, because March 21, 2021, was a Sunday, the two-year limitations period continued through Monday, March 22, 2021.  See Fed. R. Civ. P. 6(a)(1)(c); Pa. R.C.P. No. 106; see also Fullman v. City of Philadelphia, 722 F. App'x 242, 245 (3d Cir.

2018) (unpublished).  Plaintiff commenced this action on March 22, 2021, and contends that its claims fall within the applicable two-year limitations period, which includes March 21, 2019, the date of the effective termination of the Contract and the only date that falls within the two-year limitations period.

The premise for Plaintiff's contentions concerning the timeliness of its claims is that none of the conduct underlying its claims "result[ed] in an injury at the time they occurred, but were part of a design to create an injury later, upon the termination of the VA contract."  (Id. at 18.) Plaintiff posits that until the Contract termination, it did not have a complete and present cause of action, had no right to institute and maintain a suit, and had suffered no overt act causing damage.  Plaintiff also invokes the continuing violations doctrine, arguing that the doctrine renders its claims timely.  Plaintiff's contentions that its claims did not accrue until March 21, 2019, and that the continuing violations doctrine renders its claims timely are interrelated—the Court will nevertheless address the contentions separately, as Plaintiff appears to raise each argument independently.

### i.   Accrual of Claims Asserted under Count II

Plaintiff's assertions concerning the timeliness of its claims in Count I are based on the mistaken premise that all of its claims accrued on March 21, 2019, upon the VA's termination of the Contract.  Assuming the truth of its allegations, Plaintiff knew that it was being discriminated against and that it sustained discrete, actionable injuries as early as 2017.  "Each . . . 'discrete discriminatory act [alleged in the complaint] start[ed] a new clock for filing charges alleging that act.'"  See Mateo v. First Transit Inc., No. 19-cv-17302, 2021 WL 3856288, at *6 (D.N.J. Aug. 30, 2021) (quoting Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 122 (2002)).  Despite the sparsity of specific dates in its complaint, Plaintiff broadly alleges approximate dates that provide guideposts within which Defendants' alleged conduct occurred.  In this regard, assuming

22

the truth of its allegations, Plaintiff knew, as early as 2017, that it sustained injuries stemming from discrete discriminatory acts.

First, as Plaintiff's allegations make abundantly clear, and despite that its allegations are largely bereft of precise dates, Plaintiff knew of discrete injuries for which it could have obtained relief in 2017, no later than 2018, and right up until just before the VA terminated the Contract in 2019.  Plaintiff alleges, among other things, that Defendants' racially motivated conduct from late 2016 to early 2019 resulted in: (1) the rejection and delay of the VA's acceptance of its bid for the Contract; (2) the belated commencement of Plaintiff's performance under the Contract; (3) the issuance of a restricted license; (4) fines and pay reductions for tardiness; (5) delays in Plaintiff's provision of services; (6) five of Plaintiff's employees terminating their employment with Plaintiff; (7) Plaintiff's inability to present at VA hospitals with proper equipment; (8) the suspension of Plaintiff's license, which "shut down all of its operations for a week"; (9) the resignation of Plaintiff's former medical director, which forced Plaintiff to secure a replacement; (10) false reports about Plaintiff's performance and the expiration of one of Plaintiff's paramedic's licenses; (11) false accusations that Plaintiff was "cheating the government"; and (12) no calls for transport directed to Plaintiff from March 15 until March 17, 2019.  (Doc. No. 1 ¶¶ 69-71, 75-77, 87, 92, 94-96, 104, 108, 112-13, 114, 128, 138, 153, 158, 161, 172, 185, 188, 207, 212-14, 218, 226-27.)  Further, Plaintiff alleges that the conduct that caused the above injuries was a result of the differential treatment based on the race of its owner as far back as 2017.  (Doc. No. 104, 136, 13-139, 206.)

While the parties have not identified any case law that squarely fits the facts of this case, decisions addressing claims in the employment context provide a useful comparison concerning the types of "discrete" injuries that mark the accrual date of discrimination-based claims.  In this

regard, "termination, failure to promote, denial of transfer, <u>refusal to hire</u>, <u>wrongful suspension</u>, <u>wrongful discipline</u>, . . . [and] <u>wrongful accusation</u>" are discrete acts that start the running of the relevant limitations period.  <u>See</u> <u>O'Connor</u>, 440 F.3d at 127 (emphasis added).  Plaintiff's complaint alleges comparable conduct, <u>e.g.</u>: (1) wrongful license suspension; (2) issuance of a restricted license as a punishment for pretextual inspections and inspection failures; and (3) wrongful accusations about Plaintiff and its former medical director.  <u>See</u> <u>id.</u>; <u>Shaffer v. Shinseki</u>, No. 2:08-cv-01555, 2010 WL 11566410, at *2 (W.D. Pa. Mar. 19, 2010) (noting that a discrete act occurred when the "defendant submitt[ed] plaintiff to the Pennsylvania State Licensing Board of Dentistry for revocation of his license"); <u>see also</u> <u>Griffin v. State of New Jersey Dep't of Hum. Servs.</u>, No. 19-2751, 2021 WL 3780078, at *2 (3d Cir. Aug. 26, 2021) (unpublished) (noting that "[a] demotion, a failure to promote, and a single disciplinary action are discrete acts of discrimination . . .").

Moreover, as the complaint indicates, after the VA terminated the Contract on March 21, 2019, Richard J. Anzelone ("Anzelone"), Branch Chief and Contracting Officer for the VA, issued a decision denying Plaintiff's certified claim ("Certified Claim") for reimbursement for losses sustained during the life of the Contract.[9]  (<u>Id.</u> ¶ 235; Doc. No. 66-7.)  Anzelone's decision

---

[9] Plaintiff's complaint references and quotes from Anzelone's decision.  (Doc. No. 1 ¶¶ 235-38.) As with all Rule 12(b)(6) motions to dismiss, when determining whether claims are time-barred on the face of a complaint, the Court "may . . . consider documents integral to or explicitly relied upon in a complaint without converting the motion to dismiss into a motion for summary judgment."  <u>See</u> <u>Formato v. Mount Airy #1, LLC</u>, No. 3:19-cv-02237, 2020 WL 4347379, at *3 (M.D. Pa. July 29, 2020) (taking judicial notice of an exhibit submitted by the defendant in analyzing a motion to dismiss on statute-of-limitations grounds); <u>see also</u> <u>E. Steel Constructors, Inc. v. Nichols</u>, No. 03-cv-06680, 2004 WL 1878237, at *4 (E.D. Pa. Aug. 23, 2004) (citing <u>Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.</u>, 998 F.2d 1192, 1196 (3d Cir.1993)) (same).  Plaintiff asserts, in conclusory fashion, that the Court "must ignore" any exhibits "outside the Complaint" but does not dispute the authenticity of Anzelone's decision (Doc. No. 73 at 20-21)—indeed, it would be difficult for Plaintiff to dispute the decision's authenticity given that Plaintiff's allegations quote directly therefrom.  (Doc. No. 1 ¶¶ 235-39.)  The Court

reflects that Plaintiff claimed $441,243.00 in damages due to "discriminatory, harassing, and retaliatory conduct . . . dating back to 2017[.]" (Doc. No. 66-7 at 4.) As Plaintiff wrote in its Certified Claim, the VA's conduct, "specifically between May 2017 and August 2017, [caused Plaintiff to] experience[] a decline in call volume that resulted in losses of $40,000 - $60,000 per month." (Doc. No. 66-6 at 6.) Plaintiff, as it does now, also asserted a conspiracy between and/or among VA officials, UPMC, and/or EMSW aimed at derailing the VA's acceptance of Plaintiff's bid and delaying licensure of its vehicles. (Id. at 4.) The Certified Claim, as does the instant complaint, asserted conduct including: "(1) delayed calls; (2) altered logged response times; and (3) last minute or belated upgraded call levels." (Id. at 6-8, 9.) According to its representations, plaintiff sustained over $400,000 in losses due to the conspiratorial conduct alleged in the Certified Claim, all for breaches of contract that occurred "throughout the Contract period." (Id. at 19.)

For all the reasons discussed above, and assuming the truth of Plaintiff's allegations, the Court finds unavailing Plaintiff's claim that it suffered no damages from any discrete injuries from 2016 until early 2019. Therefore, unless an equitable exception to the limitations bar applies, Plaintiff's claims under Count II are time-barred. The Court turns to Plaintiff's reliance on the equitable exception found in the continuing violations doctrine.

ii.    **Application of the Continuing Violations Doctrine to Count II**

The continuing violations doctrine "is an equitable exception to the timely filing requirement." See Cowell v. Palmer Township, 263 F.3d 286, 292 (3d Cir. 2001) (internal

_____

will therefore take judicial notice of Anzelone's decision. (Doc. No. 66-7). The Court will similarly take judicial notice of the Certified Claim itself insofar as it is referenced in the decision upon which Plaintiff relies in its complaint, and given that Plaintiff does not dispute the authenticity of that document, which is certified by Plaintiff's owner and operator, B. Lamont Doyle. (Doc. No. 66-6.)

quotation marks omitted).  The doctrine is often applied in the Title VII context but has been

applied in other contexts including to § 1983 claims.  See Cowell, 263 F.3d at 292.  To invoke

the doctrine, a plaintiff must establish: (1) that "the last act evidencing the continuing practice

falls within the limitations period"; and (2) that "the defendant's conduct is more than the

occurrence of isolated or sporadic acts."  See id. (internal quotation marks omitted).  "The focus

of the continuing violations doctrine is on affirmative acts of the defendants."  See id. at 293.

Courts consider three factors when undertaking an inquiry into the applicability of the doctrine:

> (1) subject matter—whether the violations constitute the same type of
> discrimination, tending to connect them in a continuing violation; (2) frequency—
> whether the acts are recurring or more in the nature of isolated incidents; and (3)
> degree of permanence—whether the act had a degree of permanence which should
> trigger the plaintiff's awareness of and duty to assert his/her rights and whether the
> consequences of the act would continue even in the absence of a continuing intent
> to discriminate.

See id. at 292.  With respect to the permanency requirement—the "most important factor"—it

reflects the "policy rationale behind the statute of limitations," i.e., "the continuing violations

doctrine should not provide a means for relieving plaintiffs from their duty to exercise reasonable

diligence in pursuing their claims."  See id. at 295.

Having carefully considered Plaintiff's allegations and the arguments in support of its

position, the Court concludes that the continuing violations doctrine is inapplicable to Count II.

First, before addressing any of the factors identified by the Third Circuit above, the Court notes

that Plaintiff has not alleged affirmative "acts [by one or more Defendants that] occur[ed] inside

the [limitations] period which, considered in themselves, are sufficient to support liability."  See

O'Connor, 440 F.3d at 127.  The only conduct that allegedly occurred on March 21, 2019, was

that VA contracting officer Cynthia Grygier "advised Plaintiff that the VA had terminated the

Contract, effective March 21, 2019, for the 'convenience' of the government."  (Doc. No. 1 ¶

230.)  It is not alleged that any Defendant undertook overt affirmative acts—independently or as part of a larger conspiracy—occurring within the limitations period.  See, e.g., Tetratec Corp. v. E.I. Dupont De Nemours & Co., No. 90-cv-01867, 1991 WL 30244, at *3-4 (E.D. Pa. Mar. 5, 1991) (noting that the "overt acts" requirement, i.e., that a plaintiff allege acts taken in furtherance of a conspiracy within the applicable limitations period, applies in the context of the continuing violations doctrine).  Further, a "statute of limitations will not be tolled for plaintiffs who are unaware that the acts directed against them are part of a conspiracy, because such plaintiffs have no cause of action for the conspiracy itself."  See Teti v. Towamencin Twp., No. 96-cv-05402, 2001 WL 1168102, at *2 (E.D. Pa. Aug. 17, 2001), aff'd, 52 F. App'x 189 (3d Cir. 2002).  For this reason alone, Plaintiff's reliance on the continuing violations doctrine is unavailing.

Second, even assuming Plaintiff had established the requisite "subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation" and "frequency—whether the acts are recurring or more in the nature of isolated incidents," the acts alleged in the complaint "had a degree of permanence which should [have] "trigger[ed] [] [P]laintiff's awareness of and duty to assert [its] rights . . . ."  See Cowell, 263 F.3d at 292.  Thus, the third and all-important factor compels the Court to reject Plaintiff's reliance on the continuing violations doctrine.  As but a few examples of acts that had the requisite "degree of permanence," Plaintiff alleges that Defendants' conduct, prior to March 21, 2019, resulted in the following: issuance of a restricted license; suspension of its license, which forced Plaintiff to shut down its operations for one week; fines and costs associated with belated arrivals and drop-offs; and no calls from March 15 to 17, 2019.  (Doc. No. 1 ¶¶ 108, 114, 128, 188, 227.)  The consequences of these acts were sufficiently and immediately permanent such as

to trigger Plaintiff's awareness of and duty to assert its rights.

At bottom, Plaintiff's allegations assert "continual ill effects" (the VA's termination of the Contract) stemming from claims that necessarily accrued outside the limitations period, "which is insufficient to create a continuing violation." See Schottanes v. Borough Of N. Haledon, 343 F. App'x 771, 774 (3d Cir. 2009) (unpublished) (quoting Cowell v. Palmer Twp., 263 F.3d 286, 293 (3d Cir. 2001)).  Throughout its complaint, Plaintiff avers not that Defendants terminated the Contract on March 21, 2019, but that they conspired to interfere with and undermine the Contract through a series of injuries to Plaintiff "so that . . . the VA would terminate the Contract." (Doc. No. 1 ¶¶ 111, 116, 134, 153, 159, 160, 164, 171, 177, 183, 192, 194, 201, 203, 205, 207, 211-12, 217, 219, 231, 241.)  Plaintiff alleges that the VA terminated the Contract based on prior conduct, including "repeated and unwarranted checks on Plaintiff's operation." (Id. ¶¶ 236-40.)  "But for Defendants' racial animus, bias and prejudice in carrying out the acts [alleged in the complaint], Plaintiff's contract with the VA would not have been terminated . . . ." (Doc. No. 253 (emphasis added).)

In sum, all of the conduct alleged in the complaint against Defendants occurred before March 21, 2019, and Plaintiff's "time-barred claims cannot be resurrected by being aggregated and labeled continuing violations." See O'Connor, 440 F.3d at 128-29.  Plaintiff's reliance on the continuing violations doctrine is therefore unavailing.  As such, Plaintiff's §§ 1983/1985 claims are time-barred on the face of the complaint and do not lend themselves to application of the continuing violations doctrine.  See id.; see also, e.g., Arneault v. O'Toole, 864 F. Supp. 2d at 408.  The Court will therefore grant the Non-Federal Defendants' motions to dismiss Count II and dismiss Count II as time-barred as to them.

### 2.    Sufficiency of Plaintiff's §§ 1981/1983 Claims as to the Non-Federal Defendants (Count I)

Turning to the sufficiency of the only remaining federal claims asserted against the Non-Federal Defendants (Count I), Plaintiff asserts its claims under Count I pursuant to §§ 1981 and 1983.  Section 1981 prohibits discrimination in the making and enforcement of contracts.  It provides, in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

See 42 U.S.C. § 1981.  Generally, to "establish a basis for relief under section 1981 a plaintiff must show (1) that he belongs to a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) discrimination concerning one or more of the activities enumerated in § 1981."  See Est. of Oliva ex rel. McHugh v. New Jersey, 604 F.3d 788, 797 (3d Cir. 2010).  "[W]hile § 1981 creates rights, § 1983 provides the remedy to enforce those rights against state actors."  See McGovern v. City of Philadelphia, 554 F.3d 114, 116 (3d Cir. 2009).

To "properly plead an unconstitutional conspiracy," Plaintiff "must assert facts from which a conspiratorial agreement can be inferred," see Great W. Mining & Min. Co. v. Fox Rothschild LLP, 615 F.3d 159, 178 (3d Cir. 2010), and must plead those facts with "specificity under the Federal Rules of Civil Procedure," see Mansaray v. Wenner, No. 1:21-cv-00351, 2022 WL 463302, at *2 (W.D. Pa. Feb. 15, 2022).  Plaintiff must allege "'enough factual matter (taken as true) to suggest that an agreement was made,' in other words, 'plausible grounds to infer an agreement.'"  See Great W. Mining, 615 F.3d at 178 (quoting Twombly, 550 U.S. at 556).  "To constitute a conspiracy, there must be a meeting of the minds."  Startzell v. City of Philadelphia, 533 F.3d 183, 205 (3d Cir. 2008) (internal quotation marks omitted).  "Only allegations of conspiracy which are particularized, such as those addressing the period of the conspiracy, the

object of the conspiracy, and certain other actions of the alleged conspirators taken to achieve that purpose will be deemed sufficient." <u>Outterbridge v. Commonwealth of Pennsylvania Dep't of Corr.</u>, No. 00-cv-1541, 2000 WL 795874, at *3 (E.D. Pa. June 7, 2000) (quoting <u>Rose v. Bartle</u>, 871 F.2d. 331, 366 (3d Cir.1989)).  An inference of a conspiracy that can be drawn from a complaint is "no substitute for the requirement that the circumstances of the conspiracy be pleaded with specificity."  <u>See Mansaray v. Wenner</u>, No. 1:21-cv-00351, 2022 WL 463302, at *2 (W.D. Pa. Feb. 15, 2022) (quoting <u>Rose</u>, 871 F.2d. at 366).  Further, "[p]arallel but independent action by separate actors does not import conspiracy."  <u>See Loftus v. Se. Pennsylvania Transp. Auth.</u>, 843 F. Supp. 981, 987 (E.D. Pa. 1994); <u>see also</u> <u>Twombly</u>, 550 U.S. at 556-57.

In assessing the sufficiency of Plaintiff's claims asserted under Count I as against the Non-Federal Defendants,[10] the Court will collectively address the claims because they are interrelated and based on the same overarching conspiracy, and because the claims fall short of satisfying the requirement, under Federal Rules of Civil Procedure 8(b)(2), that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]"  <u>See</u> Fed. R. Civ. P. 8(b)(2).  Plaintiff has failed to plead "particularized [facts] . . . addressing the period[s] of the conspiracy" and "certain other actions of the alleged conspirators taken to achieve th[e] [object of the conspiracy]."  <u>See Outterbridge</u>, 2000 WL 795874, at *3 (quoting <u>Rose</u>, 871 F.2d. at 366).  As the EMSW Defendants observe (Doc. No. 39 at 17-18), Plaintiff's allegations bear the earmarks of so-called "shotgun pleadings," which violate Rule 8(b), insofar as they: (1) "contain multiple counts where each count adopts the allegations of all preceding counts"; (2) are "replete with conclusory, vague, and immaterial facts," including time-barred

---

[10] As the Court concluded, <u>supra</u>, the claims asserted against Rickens are time-barred, but the Court will grant Plaintiff leave to amend its claims under Count I as against him.

facts; and (3) assert "multiple claims against multiple defendants without specifying which of the defendants are responsible for which acts or omissions, or which of the defendants the claim is brought against."  See Bartol v. Barrowclough, 251 F. Supp. 3d 855, 859 (E.D. Pa. 2017) (quoting Weiland v. Palm Beach Cnty. Sheriff's Office, 792 F.3d 1313, 1320 (11th Cir. 2015)).

However, rather than granting the EMSW Defendants' motion for an order directing a more definite pleading, the Court will dismiss Count I as to the Non-Federal Defendants without prejudice to Plaintiff's right to reassert the claims in a complaint that complies with the federal pleading requirements.  By dismissing the claims in Count I without prejudice, the Court will avoid resorting to guesswork to piece together the roles of each particular Defendant and the timing as to any allegations asserted against them, individually or as part of a larger conspiracy. Accordingly, the Court will grant the Non-Federal Defendants' motions to dismiss Count I but will do so without prejudice to Plaintiff's right to file an amended complaint curing the pleading deficiencies identified herein.

### C.    Counts I & II as to the VA Defendants

In moving to dismiss Counts I and II as asserted against them, the VA Defendants raise several arguments, one of which—that the Court lacks jurisdiction to hear the claims against them—is dispositive.  In particular, the Court agrees with the VA Defendants that Plaintiff's claims asserted against them are barred by the Contract Disputes Act of 1978 ("CDA" or the "Act"), 41 U.S.C. §§ 7101-7109.  (Doc. No. 66 at 19-22.)

#### 1.    Applicable Legal Standard

The CDA "provides a narrow waiver of the United States' sovereign immunity."  See Sys. Application & Techs., Inc. v. United States, 26 F.4th 163, 170 (4th Cir. 2022) (emphasis added).  It sets forth a "comprehensive system for adjudicating certain contract claims against the government," see Hudome v. U.S. Postal Serv., No. 87-cv-01565, 1988 WL 33926, at *1 (E.D.

Pa. Mar. 31, 1988), according to which "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision," see 41 U.S.C. § 7103(a)(1).  That is, an "aggrieved contractor who wishes to pursue relief under the Act must first present a valid, written claim to the agency's contracting officer, who will issue a written decision"; "[i]f the officer denies the claim, then generally, the contractor may either appeal to the governing agency board or bring an action in the Court of Federal Claims"; "[e]ither way, further appeals may be pursued in the Federal Circuit."  See Sys. Application & Techs., 26 F.4th at 170 (citing 41 U.S.C. § 7107(a)(1)).

The Act broadly applies to any contract, express or implied, "made by an executive agency" for "the procurement of services," see 41 U.S.C. § 7102(a)(2), and the CDA's scope "encompass[es] all claims and disputes, whether arising under or relating to the contract," see RMI Titanium Co. v. Westinghouse Elec. Corp., 78 F.3d 1125, 1135 (6th Cir. 1996); see also Todd Const., L.P. v. United States, 656 F.3d 1306, 1311 (Fed. Cir. 2011) (stating that "Congress' overall purpose to confer comprehensive jurisdiction under the CDA confirms that we should read the definition of 'claim' broadly," as "Congress has chosen expansive, not restrictive, language" (quoting Alliant Techsystems, Inc. v. United States, 178 F.3d 1260, 1268 (Fed. Cir. 1999)).

Central to the VA Defendants' contentions is the fact that, "[w]hen the Contract Disputes Act applies, it provides the exclusive mechanism for dispute resolution."  See Sys. Application & Techs., 26 F.4th at 170 (quoting Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014, 1017 (Fed. Cir. 1995)).  The statute "was not designed to serve as an alternative administrative remedy, available at the contractor's option."  See Texas Health Choice, L.C. v. Off. of Pers. Mgmt., 400 F.3d 895, 898-99 (Fed. Cir. 2005) (quoting Dalton v. Sherwood Van Lines, Inc., 50 F.3d 1014,

1017 (Fed. Cir. 1995)).  Thus, as a general matter, a contractor seeking to pursue relief based on a contract with a federal agency "may seek judicial review only in the Court of Federal Claims." See B & B Trucking, Inc. v. U.S. Postal Serv., 406 F.3d 766, 770 (6th Cir. 2005).  Further, "because the CDA does not condition [the Court of Federal Claim]'s jurisdiction upon the relief sought, but upon whether claims relate to a contract," the "relief available in the Court of Federal Claims is irrelevant."  See id. (citing Ingersoll-Rand Co. v. United States, 780 F.2d 74, 80 (D.C. Cir. 1985)).

### 2.    Arguments of the Parties

The VA Defendants argue that this Court lacks subject matter jurisdiction over Plaintiff's claims based on the following: (1) Plaintiff submitted a settlement proposal and certified claim (i.e., the Certified Claim discussed, supra) pursuant to the CDA in late 2019; (2) the Certified Claim asserted breaches of contract based on the same conduct alleged in this action; (3) the contracting officer (Anzelone) issued a final decision in response to Plaintiff's claims in December 2019; (4) Plaintiff was notified of its right to file an appeal with the Board of Contract Appeals within ninety (90) days of the final decision or to commence an action in the Court of Federal Claims within twelve (12) months of the final decision; and (5) Plaintiff did not appeal through either avenue.  (Doc. Nos. 66 at 14-16, 66-6, 66-7.)   The VA Defendants further note that Plaintiff does not dispute that it did not follow the procedures laid out in the CDA.  (Doc. Nos. 77 at 3; see Doc. No. 73.)

In response to the VA Defendants' contentions, Plaintiff emphasizes that "only federal district courts can hear civil rights claims" and maintains that Counts I and II—insofar as they assert civil rights violations for race-based discrimination—fall outside the scope of the CDA. Plaintiff additionally notes that in Jones v. U.S. Postal Serv., No. 89-cv-00399, 1990 WL 5198, at *2 (D. Del. Jan. 26, 1990), the court rejected the contention that the CDA deprived it of

jurisdiction to hear the plaintiff's § 1981 claims; in doing so, the court noted that district courts have original jurisdiction over claims under federal statutes that provide for the protection of civil rights. See id. at *1 (citing 28 U.S.C. § 1343(a)(4)). Plaintiff points out that none of the cases relied upon by the VA Defendants indicate that the CDA per se bars civil rights discrimination claims even if they relate to a contract with a federal agency.

### 3.  Whether the CDA Deprives the Court of Subject Matter Jurisdiction Over the Claims Against the VA under Counts I & II

Following a thorough review of the parties' contentions, the complaint, and the exhibits provided by the VA Defendants—including the documents related to the Certified Claim and the Contract itself, as well as the relevant authorities—the Court finds the VA Defendants' arguments more persuasive.[11]  That is, in the Court's view, Plaintiff has not satisfied its initial burden of proving that jurisdiction exists. See Mortensen, 549 F.2d at 891.  In determining the applicability of the CDA, courts inquire as to whether the plaintiff's underlying claims are "essentially contractual" in nature, and a plaintiff's "title or characterization of its claims is not controlling."  See RMI Titanium, 78 F.3d at 1136; see also Evers v. Astrue, 536 F.3d 651, 658 (7th Cir. 2008) (noting that "the characterization or labeling of claims by the pleader is not controlling" in determining the CDA's applicability).  "The classification of a particular action as one which is or is not 'at its essence' a contract action depends both on the source of the rights upon which the plaintiff bases its claims, and upon the type of relief sought (or appropriate)."  N. Star Alaska v. United States, 14 F.3d 36, 37 (9th Cir. 1994) (quoting Megapulse, Inc. v. Lewis,

---

[11] As the Court discussed, supra, Plaintiff appears to summarily contend that the Court cannot consider documents outside the pleadings.  However, in deciding a Rule 12(b)(1) motion raising a factual challenge to the Court's jurisdiction, the Court may consider material that falls outside the four corners of the complaint.  See Mortensen, 549 F.2d at 891.  In any event, Plaintiff's complaint explicitly references not only the Contract but the VA's response to its Certified Claim, and Plaintiff does not dispute the authenticity of those documents.

672 F.2d 959, 968 (D.C. Cir. 1982))

Here, as Plaintiff alleges in its complaint, Defendants conspired to "undermine [its] Contract with the VA and [] deprive [it] of its rights under the Contract[.]" (Doc. No. ¶ 63.) While Plaintiff additionally asserts that Defendants conspired to deprive Plaintiff of its constitutional rights (see id.), the source of its claims—as borne out by the allegations in the complaint and the exhibits provided by the VA Defendants—is the Contract itself. Further, the relief Plaintiff seeks is similar to that sought in the Certified Claim, which, again, asserted that all of the VA's conduct from 2016 to 2019 resulted in numerous breaches of contract.

To begin with, it simply cannot be disputed that Plaintiff's "claims and disputes . . . relat[e] to the Contract." See RMI Titanium Co., 78 F.3d at 1135. Plaintiff's Certified Claim was based on allegations of discriminatory conduct that mirrors the allegations in the instant complaint, which conduct—at least according to the unequivocal representations in the Certified Claim—resulted in breaches of contract. (Doc. No. 66-6 at 2-3, 14, 19-20.) In this regard, Plaintiff's Certified Claim asserted that it was "Entitled to Compensation for Damages Due to the Officials' Breaches of Contract," and that "[d]epartment officials breached the contract," and "breached the implied covenant of good faith and fair dealing." (Doc. No. 66-6 at 19) (emphasis added). These allegations suggest that the source of Plaintiff's claims, at their essence, is the Contract itself, and the conduct alleged here is virtually identical.

Further, as to the type of relief sought or appropriate, throughout its Certified Claim, Plaintiff asserted that all of the damages it sought—even those asserting discriminatory and harassing conduct—were based on breaches of the Contract. (Id. at 2-3, 14, 20.) The Certified Claim also reflected Plaintiff's assertion that the Contract was terminated "in bad faith and/or in an abuse of discretion and thereby breached the agreement," and that VA officials "breached the

contract" and "breached the implied covenant of good faith and fair dealing."  (Id. at 14, 19.)

Plaintiff does not assert that its claims are unrelated to the Contract—nor does it assert that it seeks damages any different than the damages it sought in its Certified Claim upon claims of breaches of contract.  (Doc. No. 73 at 16-21.)  Rather, Plaintiff's position is that the Court of Federal Claims does not have jurisdiction over § 1983 claims and, therefore, the CDA is inapplicable because Plaintiff can only pursue § 1983 claims in this Court.  Taken to its logical conclusion, Plaintiff's position would require the Court to ignore the well-established principle that a Plaintiff's "title or characterization of its claims is not controlling" and abdicate its duty to independently assess whether Plaintiff's underlying claims are "essentially contractual" in nature.  See RMI Titanium, 78 F.3d at 1136.  The Court declines to do so.

Contrary to Plaintiff's apparent position, countless courts have held that a plaintiff "cannot escape the precisely drawn remedial framework outlined by the [CDA] merely by styling [a] complaint as one for redress of constitutional torts[.]"  See Evers, 536 F.3d at 658 (emphasis added).   As one court has noted, "[c]ourts have repeatedly seen through . . . artful pleadings" and "found claims to be rooted in contract, despite plaintiffs' allegations of . . . constitutional violations."  See M.E.S., Inc. v. Snell, No. 10-cv-09513, 2012 WL 1003570, at *7 (S.D.N.Y. Mar. 26, 2012) (emphasis added) (collecting cases), aff'd, 712 F.3d 666 (2d Cir. 2013); see also N. Star Alaska, 14 F.3d at 37 (noting that "[t]he jurisdictional issue . . . turns on the source of the rights upon which the plaintiff bases its claim" in rejecting the plaintiff's claim that it was seeking to enforce "extracontractual" constitutional obligations); Walber v. U.S. Dep't of Hous. & Urb. Dev., 897 F.2d 530 (6th Cir. 1990) (concluding that the CDA barred a sex discrimination claim filed in federal court).

Regarding Plaintiff's reliance on the 1990 Delaware District Court's decision in Jones,

36

Plaintiff is correct that the court there found that the CDA did not bar claims for violations of the "plaintiff's civil and constitutional rights [on the basis of] plaintiff's race."  See Jones, 1990 WL 5198, at *2.  But Jones does not, in the Court's view, hold that any claim labeled as one pursued under § 1983 necessarily falls outside the scope of the CDA.  Jones is, in any event, distinguishable, not only because the facts alleged in the complaint were different (Jones did not argue breach of contract) but also because the court in Jones did not have the benefit of a counseled Certified Claim to compare to the allegations in Jones's complaint.  See id.  Jones did not "alleg[e] that the defendants [had] breached his contractual rights," see id. at *2, but here, Plaintiff has pleaded that Defendants conspired to deprive Plaintiff of "its rights under the contract" (Doc. No. 1 ¶ 63).

Further, a comparison of Plaintiff's Certified Claim and its complaint illustrate that Plaintiff has been pursuing, after March 2019 and until present day, remedies stemming from the Contract and for breaches thereof.  See RMI Titanium, 78 F.3d at 1136 (noting district court's comparison of certified claim with the complaint).  The claims asserted in Plaintiff's Certified Claim for breaches of contract (and, relatedly, abuse of discretion in enforcement of the Contract, as well as bad faith) are based on the same course of conduct alleged here and all stem from the Contract itself.  As the VA Defendants note, the Contract contains provisions implicated by the allegations in Plaintiff's complaint—viz.: (1) licensing requirements; (2) rules regarding vehicle and equipment inspections; (3) rules, requirements, and procedures applicable to late pick-ups or delivery times; (4) the VA's right to monitor delays for assessment of payment reductions or to refuse Plaintiff's services and use the services of another; (5) the VA's authority to administer the Contract and make related determinations and findings; (6) the VA Contracting Officer's status as a member of the vehicle inspection team; (7) quality assurances

undertaken by the Government; (8) the number of required vehicles that must be available at any given time; and (9) vehicle response times and waiting times.  (Doc. No. 66-1 at 7-11.)  In light of these provisions and others, the Court cannot conclude, as Plaintiff contends, that its § 1983 claims are wholly unrelated to the Contract.

For these reasons, among others, the Court finds that Plaintiff's arguments concerning the CDA "fail[] to appreciate that . . . , notwithstanding the allegations of discrimination, its claims and alleged injuries all stem from and relate to" the Contract.  See M Nicolas Enterprises, LLC v. United States, No. 20-cv-00691, 2022 WL 558043, at *2 (Fed. Cl. Feb. 23, 2022).  Having submitted an administrative claim, and having failed to pursue either an administrative appeal or an appeal to the Court of Federal Claims, Plaintiff's claims are subject to dismissal for lack of subject matter jurisdiction.  For that reason, the Court will grant the VA Defendants' motion to dismiss Counts I and II and will do so with prejudice.

### D.      State Law Claims (Counts III & IV)

A district court may decline to exercise supplemental jurisdiction over a claim if it "has dismissed all claims over which it has original jurisdiction."  See 28 U.S.C. § 1367(c)(3).  Once the federal claims in an action have been dismissed, a district court "should ordinarily refrain from exercising [supplemental] jurisdiction in the absence of extraordinary circumstances."  See Angeloni v. Diocese of Scranton, 135 F. App'x 510, 514-15 (3d Cir. 2005) (unpublished) (quoting Tully v. Mott Supermarkets, Inc., 540 F.2d 187, 196 (3d Cir. 1976)); see also Carnegie–Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).  Accordingly, because the Court will dismiss Plaintiff's federal claims asserted in Counts I and II, the Court will decline to exercise supplemental jurisdiction over Plaintiff's state law claims.

### E.      Leave to Amend

The Third Circuit has "instructed that if a complaint is vulnerable to 12(b)(6) dismissal, a district court must permit a curative amendment, unless an amendment would be inequitable or futile."  See Phillips, 515 F.3d at 236 (citing Grayson v. Mayview State Hosp., 293 F.3d 103, 108 (3d Cir. 2002)).  "An amendment is futile if the amended complaint would not survive a motion to dismiss for failure to state a claim upon which relief could be granted."  Alvin v. Suzuki, 227 F.3d 107, 121 (3d Cir. 2000) (citing Smith v. NCAA, 139 F.3d 180, 190 (3d Cir. 1998), rev'd on other grounds, 525 U.S. 459 (1999)).  As discussed above, and as relates to the Non-Federal Defendants, the Court has concluded that the claims asserted in Count I fall short of satisfying the federal pleading requirements, and that Count II is time-barred.  The Court will grant Plaintiff leave to file an amended complaint but only as to the claims asserted against the Non-Federal Defendants under Count I, because granting leave to amend as to those claims would not necessarily be futile or inequitable.  However, the Court will dismiss Count II as to the Non-Federal Defendants with prejudice, as those claims are clearly time-barred.[12]

The Court has further concluded, as to the VA Defendants, that it lacks subject matter jurisdiction to hear Plaintiff's claims against them.  The Court will accordingly dismiss the claims against them (Counts I and II) with prejudice for lack of subject matter jurisdiction and will direct the Clerk of Court to terminate them from the above-captioned action.

## IV.   CONCLUSION

For the foregoing reasons, the Court will grant Defendants' motions to dismiss (Doc. No.

---

[12] The only ground upon which Plaintiff could overcome the time-bar as to Count II would be to establish its entitlement to the continuing violations doctrine, but as the Court noted, supra, Plaintiff has no recourse in that doctrine given that its claims did not accrue on March 21, 2019, the only date that falls within the applicable two-year limitations period.

36-38, 52, 63) in their entirety and will do so with prejudice except that it will dismiss Count I without prejudice as to the Non-Federal Defendants, i.e., the EMSW, UPMC/PARC, Commonwealth, and MAC Defendants.  An appropriate Order follows.